# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DISTRICT

| | | |
|---|---|---|
| ELORAC, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 14-cv-1859 |
| | ) | |
| v. | ) | Hon. Jorge L. Alonso |
| | ) | |
| SANOFI-AVENTIS CANADA INC. | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO AMEND ITS COMPLAINT

Defendant sanofi-aventis Canada Inc. ("Sanofi Canada"), through its counsel, hereby submits this memorandum of law in opposition to Elorac, Inc.'s Motion For Leave To File First Amended Complaint (the "Motion").

## PRELIMINARY STATEMENT

This is a commercial breach of contract case involving a license agreement between Defendant and Plaintiff. In the midst of the last weeks of discovery, Plaintiff burdens this Court and Defendant by filing a motion to amend its complaint. The motion is unnecessary and procedurally improper because Plaintiff does not seek to amend its complaint to add additional claims, or add new parties, or even assert new theories of relief. Rather, Plaintiff seeks to simply embellish the allegations of breach of contract that were already pleaded.

Plaintiff's motion to amend was apparently filed to avoid a primary defense in this case, the application of the parties' agreed-upon limitation of liability clause. Plaintiff uses Rule 15 and its motion to amend as a vehicle to advance legal arguments to this Court that are best reserved for summary judgment practice.

Indeed, although Plaintiff pleaded plainly (and wrongly) in the very first paragraph of its

Complaint filed 18 months ago that Defendant "in bad faith, has done nothing to develop, promote, market and sell the product," which allegation was then repeated several other times in sum or substance, Plaintiff now asks this Court permission to amend its complaint so it can re-state and make the same "bad faith" allegations a dozen or so more times—but without adding a single new claim for relief.

Plaintiff's purported reason for seeking to amend the pleading at this juncture is Plaintiff's recent review and unilateral interpretation of internal email communications among Defendant's employees regarding the calculation of royalties due to Plaintiff under the License Agreement. Although selectively attached and quoted by Plaintiff in its motion, those emails do not give rise to a single new cause of action, much less prove breach. In fact, the emails reflect that Defendant's employees were deliberating internally about the correct calculation of royalties due to Plaintiff under the parties' written License Agreement. Contrary to Plaintiff's arguments in its motion to amend, the emails reflect further that Defendant was employing "Commercially Reasonable Efforts" as that term was defined and agreed-to by the parties, to maximize the value of the license for which Defendant paid Plaintiff $3.7 million (CAD).

Plaintiff's characterization of those emails as proof of a breach is wrong. In any case, the proposed new allegations are not a reason to allow Plaintiff to amend its pleading in the eleventh hour of discovery. Obviously, if plaintiffs were permitted to amend their pleading to simply embellish existing claims with citations to evidence they obtained through discovery, all courts would be clogged with unnecessary motions to amend, and defendants would be forced to expend resources re-denying allegations, instead of focusing on completing discovery.

Plaintiff's real motive is not secret. In its motion, Plaintiff advances legal arguments prematurely, based on an incomplete and one-sided record, in an attempt to persuade this Court

that it should void the agreed-upon limitation of liability provision in which Plaintiff waived unequivocally the right to recover lost profits, indirect or consequential damages. Plaintiff's argument, however, is not only legally incorrect, it is procedurally misplaced. Plaintiff will be able to advance all of its best legal arguments and proffer all of its supposed smoking gun evidence during summary judgment, but to do so here via a motion to amend is improper. Plaintiff's motion should be denied.

I. THE RELEVANT FACTS

    A. The License Agreement

Plaintiff and Defendant entered into a License Agreement, executed in Montreal, Quebec, and dated October 30, 2008, wherein Plaintiff granted Defendant a license to market and sell Plaintiff's Civamide cream product within the boundaries of the nation of Canada. (Compl. Ex. A[1] & ¶ 31.)

In exchange for the license, Defendant paid Plaintiff the sum of $2 million (CAD) upon signing, and promised to pay other sums upon accomplishment of certain milestones, such as another $1.75 million (CAD) upon Plaintiff obtaining regulatory approval to sell the product from Canada's food and drug safety regulatory body, Health Canada. (Compl. Ex. A, October 30, 2008 License Agreement ("License Agreement") §§ 7.1, 7.3.) Additionally, Defendant promised to pay Plaintiff a twelve percent (12%) royalty based on net sales of the product. (Motion Ex. A, Proposed Amended Complaint ("Proposed Am. Compl.") ¶ 4.)

The parties agreed expressly, however, to the scope and extent of Defendant's duty to market and sell the product:

> "Commercially Reasonable Efforts" means efforts consistent with those generally utilized by companies of a similar size for their own internally developed

---

[1] Plaintiff omits the License Agreement from its Proposed Amended Complaint, but included it as Exhibit A to original Complaint.

pharmaceutical products *of similar market potential*, at a similar stage of their product life taking into account the existence of other competitive products in the marketplace or under development, the proprietary position of the product, the regulatory structure involved, *the anticipated profitability of the product* and other relevant factors. *It is understood that such product potential may change from time to time* based upon changing scientific, business and marketing and return on investment considerations. Sanofi-aventis' obligations with respect to Commercially Reasonable Efforts shall terminate in the event that sanofi-aventis' rights under this Agreement terminate.

(License Agreement § 1.9) (emphasis added).

The parties agreed also to the definition of "Net Sales," upon which Defendant was obligated to pay Plaintiff the 12% royalty:

> "Net Sales" means the gross selling price of the Product in the Territory invoiced by sanofi-aventis, its Affiliates and its sublicensees to Third Parties, less the following deductions and offsets: (i) credits, refunds or allowances granted upon returns, rejections or recalls, retroactive price reductions, billing corrections or other allowances; (ii) freight, shipping and insurance costs if included in the gross invoiced selling price; (iii) quantity, cash and other trade discounts, credits or allowances actually granted; (iv) customs duties, taxes and surcharges and other charges by an Authority incurred in connection with the production, sale, transportation, delivery, use, exportation or importation of Products; (v) amounts incurred for rebates or discount programs; (vi) charge backs, buying group/group purchasing organization administrative fees or managed care organization rebates or fees; and (vii) distribution fees and sales commissions paid to non-Affiliates of sanofi-aventis, all of such deductions and offsets to be calculated in accordance with standard allocation procedures, allowance methodologies and accounting requirements consistently applied, which methods shall be in accordance with generally accepted accounting principles, consistently applied. "Net Sales" shall not include any amount on account of Products provided to Third Parties or used for research and development, clinical trials, physician samples, patient assistance programs, or compassionate use.

(*Id.* § 1.36.)

To leave no doubt, the parties also agreed that "Third Parties" meant: "a person or entity other than (i) Licensor or any of its Affiliates and (ii) sanofi-aventis or any of its Affiliates." (*Id.* § 1.53.) A third party, thus, could include a distributor or wholesaler, often used in the pharmaceutical business.

Last but not least, Plaintiff and Defendant agreed to limit their liability for breach of the License Agreement. In the only "all caps" language in the entire agreement, the parties agreed expressly that:

> 13:4 IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR LOSS OF PROFITS, SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF ANY BREACH OF THIS AGREEMENT.

(*Id.* § 13.4) (emphasis in original). Instead of allowing either side to bring a claim for lost profits, the parties agreed that if Defendant materially breached the License Agreement and failed to cure its breach, Plaintiff retained the right to terminate the License Agreement.[2] (*Id.* § 14.4.) Defendant retained the right to terminate the License Agreement at any time by providing 180 days' prior written notice. (*Id.* § 14.2.)

In sum, Defendant paid Plaintiff a considerable sum for the license to market and sell the product in Canada, in exchange for which the parties agreed that Defendant would be required to commercialize the product, but only to the extent it was commercially reasonable to do so and only to the extent it would do so if Defendant had developed the product itself. And if Plaintiff believed that Defendant failed to perform its commercialization obligations under the License Agreement, Plaintiff retained the right to terminate the agreement and sue to recover only actual costs—but it waived the right to sue for lost profits.

    B.    <u>The Parties' Performance Under The License Agreement</u>

        1.    <u>Plaintiff's Inability To Obtain Broad Regulatory Approval For Sale of The Product To All Canadian Osteoarthritis Sufferers</u>

Under the License Agreement, Plaintiff was obligated to obtain regulatory approval from Health Canada for the sale of the Civamide cream product, a prescription topical cream for the

---

[2] To date, Plaintiff has not terminated the License Agreement.

treatment of osteoarthritis pain. (License Agreement § 10.1) Plaintiff represented to Defendant that it would obtain, and later sought, a general indication for the treatment of all osteoarthritis joint pain.  (September 1, 2015 Declaration of Leeanne Mancari ("Mancari Decl.") Ex. 1, October 15, 2009 Notice of Non-Compliance ("NON") at 2.)³

Less than twelve months after signing the License Agreement, however, Plaintiff's new drug submission for approval to sell the product in Canada with the proposed, general indication *was rejected.* (NON at 1-2.)

Defendant played no part in the clinical studies or the filing of the NDS, relying entirely on Plaintiff and its contractual promise that it would obtain regulatory approval. (License

---

³ This Court may review an opposition to a motion to amend a complaint under the same standards as a motion to dismiss under Rule 12(b)(6). *Vargas-Harrison v. Racine Unified Sch. Dist.*, 272 F.3d 964, 974 (7th Cir. 2001). Under Rule 12(b)(6), this Court may consider documents referenced or relied upon in a complaint, but not attached, as well as documents filed with governmental regulatory authorities about which there is no dispute of authenticity. *Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009) (court may consider documents referenced but not attached to pleading on motion to dismiss); *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002) (same); *Howell v. N. Cent. Coll.*, 331 F. Supp. 2d 660, 664 (N.D. Ill. 2004) (denying plaintiff's motion to amend her complaint as futile after considering documents referenced in but not attached to the proposed amended complaint); *see also Houston v. Medtronic, Inc.*, 957 F. Supp. 2d 1166, 1170 (C.D. Cal. 2013) (permitting review of FDA regulatory documents, as well as transcripts of meetings held with government regulators); *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1023 (C.D. Cal. 2008) (permitting review of indisputable product information and FDA filed documents on motion to dismiss). To that end, Defendant respectfully submits as part of its opposition certain documents cited by or relied upon by Plaintiff, which Plaintiff failed to attach to either the Complaint or Proposed Amended Complaint, as well as certain regulatory filings with Health Canada, about which there is no dispute of authenticity.

Agreement § 10.1.)  If Plaintiff failed to obtain regulatory approval, then there would be no product to sell in Canada.

Only after Defendant's regulatory experts stepped in to meet with Health Canada officials and provide assistance was Plaintiff able to obtain regulatory approval for the sale of the product in Canada—but not with the broad, general indication proposed.  (Mancari Decl. Ex. 2, July 15, 2010 Notice of Compliance.)  Instead, sale of the product in Canada was strictly limited:

> [The product] is indicated to be used in conjunction with oral COX-2 inhibitors or NSAIDS for the relief of severe pain in adult patients with osteoarthritis of the knee, not controlled with oral COX-2 inhibitors or NSAIDs alone, for a duration of no more than three months.

(Mancari Decl. Ex. 3, July 14, 2010 Product Monograph.)[4]

As a result of this delayed and very restricted indication, the market potential of the drug was reduced significantly.  Nonetheless, having obtained regulatory approval, Defendant paid Plaintiff the $1.75 million (CAD) milestone pursuant to the License Agreement.  (License Agreement § 7.3.)

### 2. Defendant's Commercialization Efforts

World economic conditions changed in the nearly two year period it took Plaintiff to obtain regulatory approval for the sale of the product in Canada.  In August, 2010, Sanofi Canada, as the lawful and exclusive licensee to the Civamide cream compound, for which license it already paid Winston $3.75 million (CAD), and fully consistent with its commercialization obligations to market and sell the product in a commercially reasonable manner (as it would any

of its own products with similar economic viability), notified Plaintiff that it was searching for a partner to market and sell the product, and that it would not be using its own sales force to do so. (Proposed Am. Compl. ¶ 65; *see also* Compl. ¶ 46.)

On December 9, 2010, Plaintiff received regulatory approval for sale of the product under the brand name Zuacta™.[5] (Mancari Decl. Ex. 4, December 8, 2010 Notice Of Compliance For Product Name Change.) Thus, with an approved compound, and an approved name, the product marketing and promotional materials for the product could be prepared for launch.

On July 18, 2011, Defendant entered into a Distribution Agreement with Valeant for the distribution, sale and marketing of Zuacta™. (Proposed Am. Compl. ¶ 84.) Unlike a license agreement, the Distribution Agreement did not confer intellectual property rights. (Mancari Decl. Ex. 5, July 18, 2011 Distribution Agreement Between Sanofi Canada And Valeant ("Distribution Agreement").) Furthermore, the Distribution Agreement did not assign to Valeant any of Sanofi Canada's rights or delegate Sanofi Canada's obligations under the License Agreement. (*Id.*) Rather, all rights under the License Agreement were retained by Sanofi Canada, and Sanofi Canada still assumed responsibility for the carrying out of all of its obligations under the License Agreement.

Once Winston was able to provide the product to Sanofi Canada for sale, the Zuacta™ product was launched immediately in August, 2011.

### 3. Defendant's Payment of Royalties

Upon the sale of the product from Defendant to Valeant, Defendant turned to payment of

royalties due and owing Plaintiff under the License Agreement. As Plaintiff recounts, certain of Defendant's employees deliberated the proper method to calculate and pay Plaintiff the royalties due under the License Agreement. (Proposed Am. Compl. ¶¶ 87, 119). As Manon Decelles, Sanofi's business development manager testified, ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████ (Mancari Decl. Ex. 8, Depo. Tr. of Manon Decelles, 77:2-78:21; *see also* License Agreement § 7.7.)

II. THE LAWSUIT

On March 17, 2014, Plaintiff filed its Complaint in this Court, alleging two different breach of contract claims. (Compl. ¶¶ 82-100.) In its first claim, Plaintiff asserted that Defendant breached the License Agreement by improperly calculating the amount of royalties due to Plaintiff. (*Id.* ¶¶ 82-90.) In its second claim, Plaintiff asserted that Defendant breached the License Agreement by failing to use "Commercially Reasonable Efforts" to market and sell the product. (*Id.* ¶¶ 91-100.) Based on these two claims, Plaintiff is seeking $225,000 (USD) in damages based on an alleged miscalculation of royalty payments and over $20 million (USD) in damages based on an alleged breach of the commercialization obligations. (Compl. ¶¶ 2, 99.)

Defendant has denied all wrongdoing and maintains that the royalty payments were calculated in perfect compliance with the License Agreement.

Defendant also maintains that it employed all "Commercially Reasonable Efforts" to market and sell the product, indeed exceeding those required under the License Agreement, for a product of "*of similar market potential*, at a similar stage of their product life taking into account the existence of other competitive products in the marketplace or under development, the

proprietary position of the product, the regulatory structure involved, *the anticipated profitability of the product* and other relevant factors." (*See generally* Answer & License Agreement § 1.9.)

On August 4, 2015, Plaintiff filed the instant motion seeking leave to amend its Complaint. In its proposed amended complaint, Plaintiff again asserts the same two breaches of the License Agreement. Respectfully, Plaintiff's motion to amend its complaint should be denied.

## ARGUMENT

Although "freely given when justice so requires," leave to amend under Fed. R. Civ. P. 15(a) "is not to be automatically granted." *Johnson v. Methodist Med. Ctr. of Ill.,* 10 F.3d 1300, 1303 (7th Cir. 1993). "[G]ranting or denying a motion for leave to file an amended pleading is a matter purely within the sound discretion of the district court." *J.D. Marshall Ina, Inc. v. Redstart, Inc.,* 935 F.2d 815, 819 (7th Cir. 1991). In exercising that discretion, a district court may deny leave to amend for reasons of "bad faith or dilatory motive on the part of the movant . . . undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of the amendment, etc." *Id.* (internal citation omitted). A court should also "consider the likelihood that the new claim is being added in a desperate effort to protract the litigation and complicate the defense," *Glatt v. Chicago Park District,* 87 F.3d 190, 194 (7th Cir. 1996), as well as whether the amendment would cause "clutter and confusion." *Chaveriat v. Williams Pipe Line Co.,* 11 F.3d 1420, 1428-29 (7th Cir. 1993).

Courts deny motions for leave to amend where the proposed new allegations do not support any new claim or add substance to the case, but merely serve to embellish the existing allegations. *See, e.g., Coleman v. Ramada Hotel Operating Co.*, 933 F.2d 470, 473 (7th Cir. 1991) (affirming denial of motion to amend, "Coleman sought leave to supplement her complaint

with several additional allegations. But these additional allegations merely reiterate and embroider the claims Coleman already presented in her original complaint, adding little, if anything, of substance to her case."); *Vann v. Fischer*, No. 09CV385, 2010 WL 2889538 (W.D.N.Y. July 21, 2010) (denying leave to amend pleading because the amendment was unnecessary and "the additional allegations merely reiterate[d] and embroider[ed] the claims already presented in the original Complaint, adding little, if anything, of substance to the case"); *see also Scottish Air Int'l v. British Caledonian Grp., plc*, 152 F.R.D. 18, 30 (S.D.N.Y. 1993) (same).

Plaintiff's motion for leave to amend the complaint should be denied because Plaintiff's proposed amended pleading adds little, if any, substance to the already existing complaint, and most obviously does not seek to add or remove any of the existing claims or parties.

    A.    Plaintiff's Proposed Amended Complaint
    <u>Does Not Include Any New Claims Or Theories Of Relief</u>

Plaintiff pleaded two distinct breach of contract claims in its original complaint, which sufficiently apprised Defendant of the basis of its claims under federal pleading standards. Indeed, Plaintiff's theory of relief remains the same today as it was when the Complaint was filed on March 17, 2014:

> 1. This is a breach of contract action that arises out of Sanofi's failure to use commercially reasonable efforts to develop, market, promote, and sell Plaintiffs Civamide cream (a topical cream used to treat osteoarthritis) (the "Product"), despite Sanofi's obligation to commercialize the Product in good faith under a license agreement between the parties. Instead of using commercially reasonable efforts to develop, market, promote, and sell Plaintiffs Product (as required by the license agreement), Sanofi has, in bad faith, done nothing to develop, market, promote, and sell the Product. Indeed, Sanofi has, without Plaintiffs permission, attempted to shift Sanofi's responsibilities onto a third party that has not been able to commercialize the Product and, in fact, has ceased all efforts to develop, market, promote, and sell the Product altogether. To make matters worse, Sanofi has also refused to pay royalties as required under the license agreement between the parties. Sanofi has created a scheme whereby it pays to Plaintiff only 12% of

the net sales that Sanofi has made to the third party that Sanofi has shifted its responsibilities onto, rather than 12% of all net all net sales of the Product sold in Canada pursuant to the terms of the license agreement.

(Compl. ¶ 1.)

In its original pleading, Plaintiff elaborated its theory of a bad faith "scheme" that Defendant failed to properly calculate and pay royalty payments:

> 86. In July of 2013, Plaintiff discovered that Sanofi has paid to Plaintiff only 12% of the net sales that Sanofi has made to Valeant (the third party that Sanofi shifted its responsibilities onto), rather than 12% of all net sales of the Product in Canada.

(Compl. ¶ 86.)

Plaintiff also detailed its theory in its original complaint that Defendant breached its commercialization obligations in "bad faith" by refusing Plaintiff's demand that Defendant pay over $73,000 (CAD) on Plaintiff's behalf to submit a supplemental regulatory filing, and by allegedly failing to commercialize the product by virtue of entering into a fairly commonplace "Distribution Agreement" with the established and well-known pharmaceutical sales giant, Valeant International:

> 64. On September 11, 2012, Winston objected to Sanofi's refusal to submit a request to Health Canada to remove the words "for a duration of no more than three months" as a bad faith breach of Sanofi's obligation to use commercially reasonable efforts to develop, market, promote, and sell the Product.
>
> 96. Specifically, Sanofi has done nothing to develop, market, promote, or sell the Product in Canada and, instead, has attempted to shift its responsibilities onto an inadequate and unapproved third party that has also failed to develop, market, promote, or sell the Product.

(Compl. ¶¶ 64 & 96.)

In its Proposed Amended Complaint, Plaintiff seeks to assert the same two claims for breach of contract. The only distinction in the Proposed Amended Complaint is that Plaintiff has added several more allegations that Defendant intentionally breached the License Agreement, or

employed "bad faith," and cites emails or portions thereof, which Plaintiff summarily concludes demonstrate intentional breach. (*See e.g.* Proposed Am. Compl. ¶¶ 53, 56, 58, 87, 117, 119.)

Defendant, of course, denies all such allegations of breach, and emphatically denies the baseless charges of intentional breach or bad faith. But more to the point, these additional allegations cause confusion, create clutter, and complicate the proceedings. They do not support any new claim for relief; indeed, at most they are duplicative of the allegations already pleaded, and serve merely to emphasize Plaintiff's foregone (and false) conclusion in its original complaint that Defendant failed to perform the agreement in "bad faith."

Because Plaintiff's Proposed Amended Complaint contains no new claims, the Court should deny Plaintiff's motion to amend.

> B. New York Law Will Not Allow Plaintiff To Avoid The Limitation Of Liability Provision, But In Any Case, Plaintiff's Legal Argument Is Misplaced In Its Motion To Amend And Does Not Justify Amending The Complaint

Plaintiff cites New York law in its motion to amend to argue that Plaintiff should not be bound by the express limitation of liability provision and its waiver of any claim for lost profits, if Plaintiff can prove a bad faith breach of contract. (Motion, ¶ 15; *see also* License Agreement, § 13.4 ("IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR LOSS OF PROFITS, SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF ANY BREACH OF THIS AGREEMENT")) (emphasis in original).

Plaintiff is wrong on the law, and its argument is procedurally misplaced.

New York law enforces limitation of liability provisions. *See Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 384 (N.Y. 1983) ("For apt is the statement that public policy is not undermined by a frank recognition of such a perfectly common and acceptable business practice,

by which an entrepreneur may provide protection against its own fault."); *see also Duane Reade v. 405 Lexington, L.L.C.*, 800 N.Y.S.2d 664, 666-67 (App. Div. 2005) (same); *see also Biotronik, A.G. v. Conor Medsystems Ireland, Ltd.*, 939 N.Y.S.2d 739, *14 (Sup. Ct. New York Cnty. 2011) (court dismissed the action insofar as it sought unrealized future sales profits, reasoning that they were consequential damages, and thus were barred by the distribution agreement's limited liability provision).

Royalties are lost profits, and routinely barred from recovery where a party has agreed to a limitation of liability provision precluding recovery of lost profits or consequential damages. *See Bardy v. Cardiac Science Corp.*, 2:13-cv-00778, 2014 WL 294526 (W.D. Wash. Jan. 27, 2014) (limited liability provision foreclosed actions for lost profits, and plaintiff's claim for royalties "constitutes a paradigmatic example of lost profits"); *see also DiAthegen, LLC v. Phyton Biotech, Inc.*, 1:12-cv-1146, 2013 WL 3280270, *2 (W.D. Tex. June 26, 2013) (affirming an arbitration panel's holding that lost royalties were "consequential damages barred by the parties sublicense agreement," which contained a limitation-of-liability provision that prohibited the award of lost profits).

Furthermore, New York courts are loathe to deny enforcement of such limitation of liability provisions based on specious claims of intentional breach. Instead, to set aside an express, agreed-upon limitation of liability provision, a plaintiff must show not only that the defendant intentionally breached the contract, but did so without any legitimate economic business reason. *See Devash LLC v. German Am. Capital Corp.*, 959 N.Y.S.2d 10, 14 (App. Div. 2013), *leave to appeal denied*, 21 N.Y.3d 863 (2013) (refusing to set aside parties' limitation of liability provision where intentional breach was done to serve defendant's legitimate business self-interest); *In re Vivaro Corp.*, No. 12-13810 (MG), 2014 WL 486288, *5

(Bankr. S.D.N.Y. Feb. 6, 2014) (enforcing the underlying contract's limited liability provision and dismissing plaintiff's claims where alleged intentional breach was done with business justification).

In any event, these arguments are premature and procedurally improper in a motion to amend. Plaintiff will have its opportunity, in due course, to submit its evidence and arguments in favor of its claims. In the meantime, Plaintiff's motion to amend should be denied.

## CONCLUSION

For the foregoing reasons, sanofi-aventis Canada Inc. respectfully requests that the Court enter an order denying Elorac Inc.'s Motion for Leave to Amend Its Complaint and granting all such further relief the Court deems equitable and just.

Dated: September 2, 2015   SANOFI-AVENTIS CANADA INC.


By:  /s/ *Christopher M. Strongosky*
One of its attorneys

Leeanne S. Mancari (*admitted pro hac vice*)
Christopher M. Strongosky (*admitted pro hac vice*)
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020
212.335.4500 (p)
212.335.4501 (f)
christopher.strongosky@dlapiper.com
leeanne.mancari@dlapiper.com

Raj N. Shah (ARDC # 6244821)
Eric M. Roberts (ARDC # 6306839)
DLA PIPER LLP (US)
203 North LaSalle Street, Suite 1900
Chicago, IL  60601-1293
312.368.4000 (p)
312.236.7516 (f)
raj.shah@dlapiper.com
eric.roberts@dlapiper.com

## Certificate of Service

I hereby certify that on September 2, 2015, I electronically filed the foregoing **Defendant's Memorandum of Law In Opposition To Plaintiff's Motion For Leave To Amend Its Complaint** using the ECF System for the United States District Court for the Northern District of Illinois, 219 South Dearborn Street, Chicago, Illinois. Notice of this filing will be sent by operation of the Court's electronic filing system to all counsel of record registered on the ECF system.

    /s/ *Christopher M. Strongosky*
Raj N. Shah (ARDC # 6244821)
DLA PIPER LLP (US)
203 North LaSalle Street, Suite 1900
Chicago, IL 60601-1293
T: 312.368.4000