# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DISTRICT

| | | |
|---|---|---|
| ELORAC, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 14-cv-1859 |
| | ) | |
| v. | ) | Hon. Jorge Alonso |
| | ) | |
| SANOFI-AVENTIS CANADA INC. | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
## MOTION TO EXCLUDE THE TESTIMONY OF EDWARD F. WALTON

# TABLE OF CONTENTS

BACKGROUND ................................................................................................................. 3

    A.    FACTS ............................................................................................................. 3

        1.    The October 30, 2008 License Agreement Between Winston And Sanofi Canada ................................................................................. 3

        2.    Health Canada Approves Sale Of The Product Under A Limited Indication On July 15, 2010 .................................................................. 6

        3.    Elorac Files This Lawsuit In March 2014 .............................................. 7

    B.    DR. WALTON'S OPINION REGARDING ELORAC'S LOST PROFITS AND CONSEQUENTIAL DAMAGES ....................................... 8

        1.    Qualifications ......................................................................................... 8

        2.    Summary Of Dr. Walton's Damages Opinion ......................................... 8

        3.    Assumptions ........................................................................................... 9

        4.    Methodology ........................................................................................ 10

ARGUMENT ................................................................................................................... 12

I.    DR. WALTON'S DAMAGES OPINIONS SHOULD BE EXCLUDED BECAUSE THEY ARE BASED ON HIS IPSE DIXIT, AND NOT BASED ON SUFFICIENT FACTS OR DATA ................................................................... 14

    A.    Dr. Walton's Theory On Causation And His Lost Profits Opinion Have No Basis Beyond Dr. Walton's Ipse Dixit ............................................. 14

    B.    Dr. Walton Is Unqualified To Make Assumptions About The Ability Of Elorac To Achieve Rapid Worldwide Regulatory Approval ..................... 18

    C.    Dr. Walton's Use Of An Internal Sanofi Canada Forecast To Calculate Foreign Lost Profits Is Unreliable And He Admits It Fails To Satisfy His Own Standards In Everyday Practice ................................................. 19

II.    DR. WALTON'S DAMAGES OPINION SHOULD BE EXCLUDED BECAUSE HE IS UNQUALIFIED TO SELECT BENCHMARKS FOR EVALUATING PEAK SALES ......................................................................... 23

III.    DR. WALTON'S CALCULATION OF CANADIAN-BASED DAMAGES WILL NOT ASSIST THE TRIER OF FACT BECAUSE HIS OPINION IS BASED ON BASIC MATH ............................................................................ 24

CONCLUSION ................................................................................................................ 25

**Page(s)**

**CASES**

*Am. Honda Motor Co., Inc. v. Allen,*
600 F.3d 813 (7th Cir. 2010) ..........................................................................14, 21

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
509 U.S. 209 (1993)..................................................................................................16

*Brown v. Burlington N. Santa Fe Ry. Co.,*
765 F.3d 765 (7th Cir. 2014) ..............................................................12, 13, 18

*Chateau Vill. N. Condo. Ass'n v. Am. Family Mut. Ins. Co.,*
No. 14 cv 01583, 2016 WL 1444626 (D. Colo. Apr. 13, 2016) ...........................15

*Concord Boat Co. v. Brunswick Corp.,*
207 F.3d 1039 (8th Cir. 2000) ................................................................................16

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993)..................................................................................12, 18, 23

*Dhillon v. Crown Controls Corp.,*
269 F.3d 865 (7th Cir. 2001) ..........................................................................13, 24

*El Aguila Food Prods., Inc. v. Gruma Corp.,*
131 F. App'x 450 (5th Cir. 2005) ...........................................................................16

*Gayton v. McCoy,*
593 F.3d 610 (7th Cir. 2010) ..........................................................................19, 24

*Infinicon, Inc. v. Verionix, Inc.,*
___ F. Supp. 3d ___, 2016 WL 1611379 (S.D.N.Y. 2016) ............................20, 21

*Kumho Tire Co. v. Carmichael,*
526 U.S. 137 (1999)..................................................................................13, 15, 21

*Loeffel Steel Prods. Inc. v. Delta Brands, Inc.,*
387 F. Supp. 2d 794 (N.D. Ill. 2005) .....................................................................23

*N. States Power Co. v. City of Ashland, Wis.,*
No. 12 cv 602, 2015 WL 1745880 (W.D. Wis. Apr. 16, 2015).............................17

*Nolan v. United States,*
No. 12 cv 247, 2015 WL 5159888 (N.D. Ill. Sept. 1, 2015)..................................13

*Padilla v. Hunter Douglas Window Coverings, Inc.*,
    14 F. Supp. 3d 1127, 1132 (N.D. Ill. 2014) ............................................................12, 19, 24

*R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*,
    99 cv 1174, 2004 WL 1613563 (N.D. Ill. July 19, 2004) ........................................................16

*Rosen v. Ciba-Geigy Corp.*,
    78 F.3d 316 (7th Cir. 1996) .......................................................................................................14, 21

*Schiller & Schmidt, Inc. v. Nordisco Corp.*,
    969 F.2d 410 (7th Cir. 1992) .......................................................................................................24

*Scott v. Chuhak & Tecson, PC*,
    No. 09 cv 6858, 2011 WL 4462915 (N.D. Ill. Sept. 26, 2011)...............................................17

*Target Market Publ'g, Inc. v. ADVO, Inc.*,
    136 F.3d 1139 (7th Cir. 1998) .....................................................................................................13, 20

*TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.*,
    491 F.3d 625 (7th Cir. 2007) .......................................................................................................20, 22

*United States v. Mamah*,
    332 F.3d 475 (7th Cir. 2003) .......................................................................................................16

*Victory Records, Inc. v. Virgin Records Am., Inc.*,
    No. 08 cv 3977, 2011 WL 382743 (N.D. Ill. Feb. 3, 2011)....................................................13, 20, 23

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
    395 F.3d 416 (7th Cir. 2005) .......................................................................................................13, 20, 21, 24

## OTHER AUTHORITIES

FDA, *The Drug Development Process: Step 3: Clinical Research* (available at
    http://www.fda.gov/ForPatients/Approvals/Drugs/ucm405622.htm).......................................3

Fed. R. Evid. 702 .............................................................................................................................12, 13, 16, 20

https://www.nlm.nih.gov/services/ctphases.html. ..........................................................................3

Plaintiff Elorac, Inc. ("Elorac") has designated Dr. Edward Fintan Walton to testify as one of its two damages experts. Dr. Walton opines specifically as to his estimate of Elorac's worldwide profits that it would have realized "but for" Defendant's sanofi-aventis Canada, Inc.'s ("Sanofi Canada") alleged breach of an October 30, 2008 license agreement ("License Agreement"), between Winston Laboratories, Inc. ("Winston") and Sanofi Canada.[1] After his sophistry, Dr. Walton opines that a drug that has struggled to sell $3 million (CAD) in Canada, the only place where it is approved for sale, should have generated worldwide sales exceeding $2 billion (USD). According to Dr. Walton, had Defendant "successfully" launched civamide cream ("Zuacta") in Canada, Elorac would have realized almost $500 million (USD) in profits.

Elorac and its affiliate Winston have not, in their combined history, realized total revenues anywhere approaching $500 million. To arrive at his estimate of $500 million in worldwide damages, Dr. Walton necessarily foregoes the rigorous analysis demanded of an expert in favor of inappropriate and unsustainable assumptions.

To wit, Dr. Walton's entire opinion rests upon an unsupported thesis. Dr. Walton assumes that if Zuacta reached ███████████ in short-term Canadian sales, Elorac surely would have found licensing partners in the United States, Europe, and Japan. Although Dr. Walton cannot identify these partners by name, he further assumes that these licensing partners would have financed all of the requisite clinical trials, undertaken the burdensome process of filing for regulatory approval in far-flung markets, and would have done so successfully on an expedited basis. Assuming this team of white knight licensing partners actually would have

---

[1] Winston assigned its rights under the License Agreement to Elorac on October 11, 2012. Winston and Elorac are closely affiliated, share the same building and many of the same principals. Notably, both companies were founded by Dr. Joel Bernstein, and he serves as the Chief Executive Officer of Winston, and the Executive Chairman of Elorac.

achieved worldwide regulatory approval in short order, Dr. Walton opines that the global sales of Zuacta would thereafter generate more than $2 billion.

There are gaping holes in Dr. Walton's assumptions. His premise ignores the undisputed factual record. Other than Sanofi Canada, Elorac failed, despite sustained efforts, to find any other licensing partner, anywhere around the world. Elorac also failed to obtain regulatory approval despite submissions to the U.S. Food & Drug Administration ("FDA"), the European Medicines Agency (through Sweden), and the United Kingdom's Medicines & Healthcare products Regulatory Agency.

There is utterly no basis whatsoever to assume that achieving $3 million (CAD) of sales in Canada upon Zuacta's launch would assure commercialization partners, successful clinical trials, expedited regulatory approval, and blockbuster-level sales around the world—in roughly a two year period. Dr. Walton cited no support in the study of economics, finance, or the pharmaceutical industry for his fictional ███████████ "threshold" theory. In the end, the support for Dr. Walton's theorized cascade of good fortune coming to Elorac "but for" Defendant's alleged breach turns out to be simply his own say-so, the *ipse dixit* of Dr. Walton.



Dr. Walton is under the misapprehension that the Seventh Circuit demands less rigor of an expert in the courtroom than the rigor the expert would employ for his everyday clients.

Elorac's obvious objective is for Dr. Walton to make a $500 million worldwide case out of a localized dispute, where all consequential damages such as lost profits and speculative worldwide sales revenue are barred expressly by the contract's limitation of liability provision. Dr. Walton's damages opinion relies on an unreliable theory of worldwide commercialization and regulatory approval, fed by completely unsupportable assumptions, to meet wholly arbitrary thresholds, conjured up by Dr. Walton himself. Dr. Walton's opinion should be excluded in its entirety.

## BACKGROUND

A.    FACTS[2]

1.    **The October 30, 2008 License Agreement Between Winston And Sanofi Canada**

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████ ██ ███████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████

---

[2] These facts are admitted by Elorac or contained in undisputed documents and are offered in summary fashion for this motion. Sanofi Canada will provide additional details and undisputed facts derived from the evidentiary record in its forthcoming summary judgment motion, or as the Court may request.

[3] "Clinical studies" or trials in the pharmaceutical industry involve studying the effects of medications on humans. Phase III clinical studies involves testing the effects of a medication on a large group of people, to confirm its effectiveness, side effects, to compare it to other commonly used treatments, and collect information to determine drug safety. https://www.nlm.nih.gov/services/ctphases.html. Phase III clinical testing is a hallmark prerequisite to regulatory approval by the FDA and by many other health care regulatory agencies, worldwide. FDA, *The Drug Development Process: Step 3: Clinical Research* (available at http://www.fda.gov/ForPatients/Approvals/Drugs/ucm405622.htm).

3

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████

Nor was Winston able to obtain regulatory approval for sale of civamide cream. ███████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

Sweden's regulatory authority declined to approve Winston's MAA because "potential serious risks to public health . . . preclude[d] a recommendation for market authorization." (Decl. Ex. 10 at 5 (July 10, 2009 MPA final report).) Specifically, Winston had not put forth sufficient studies which excluded the "carcinogenic potential of [the Product] with an adequate level of certainty." (*Id.* at 23.)

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████

On July 1, 2010, Winston attempted to obtain approval for the sale of civamide cream in the U.S., and filed a new drug application ("NDA") with the FDA. (Decl. Ex. 17 (Aug. 30, 2010

FDA "Refusal To File" letter).) The FDA determined that Winston's application was "not sufficiently complete to permit a substantive review," and that Winston needed to provide "one or more additional adequate and well-controlled Phase 3 clinical studies," so that the product's clinical efficacy could be assessed. (*Id.*) ███████████████████████

███████████████████████████████ Before every regulatory agency worldwide, a persistent problem arose: Winston had not undertaken sufficient clinical studies to obtain regulatory approval, much less proceed with the application processes.

In 2008, Winston and Sanofi Canada negotiated and executed a License Agreement that granted Sanofi Canada the exclusive right to sell Winston's civamide cream in Canada. (Decl. Ex. 9 (Oct. 30, 2008 License Agreement).) Sanofi Canada's obligation to commercialize the product was contingent upon Winston obtaining regulatory approval from the Canadian government ("Health Canada") (*id.* at §10.1) and Winston's promise to manufacture and supply the product to Sanofi Canada (*id*. at §§ 4.1-4.18). The parties further agreed upon the scope and extent of Sanofi Canada's commercialization obligations. (*Id.* at § 1.9.)

In the only "all caps" language in the License Agreement, Winston expressly agreed that "IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR LOSS OF PROFITS, SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF ANY BREACH OF THIS AGREEMENT." (*Id.* at § 13.4.)

In consideration, Sanofi Canada paid Winston $2 million (CAD) on signing the License Agreement. (*Id.* at § 7.1; *s*███████████████████████

████████ Sanofi Canada also agreed to pay another $2 million (CAD) if Winston obtained regulatory approval by June 30, 2010, or $1.75 million (CAD) if approved after. (Decl. Ex. 9 at

§ 7.3 (License Agreement).)  Sanofi Canada also agreed to pay a 12% royalty to Winston upon "Net Sales" of the product, as defined in the License Agreement.  (*Id.* at § 7.7.)

2. **Health Canada Approves Sale Of The Product Under A Limited Indication On July 15, 2010**

Winston submitted its "New Drug Submission" to Health Canada on October 29, 2008. In it, Winston sought a broad indication and proposed label:  "Civanex[TM] (civamex (zucapsaicin) cream, 0.075%) a topical analgesic indicated for the relief of the signs and symptoms associated with osteoarthritis of the knee in adults."  (Decl. Ex. 8 at 1 (Oct. 29, 2008 Letter from M. Speagle to M. Schwartz of Health Canada, enclosing Winston's NDS).)

On October 15, 2009, Health Canada rejected Winston's application.  (Decl. Ex. 11 (Oct. 15, 2009 Notice Of Non Compliance).)  Health Canada advised specifically that Winston's "pivotal trial was not designed to assess the efficacy and safety of CIVANEX" for the proposed indication.  (*Id.* at 3.)

In response, Winston and Sanofi Canada arranged a meeting with Health Canada.  ███

████████████████████████████████████████████████████████████████

████████████████████████████  On July 15, 2010, Health Canada approved Winston's New Drug Submission and granted Winston the right to market and sell civamide cream in Canada, with the following indication:

> to be used in conjunction with oral COX-2 inhibitors or NSAIDs for the relief of severe pain in adult patients with osteoarthritis of the knee, not controlled with oral COX-2 inhibitors or NSAIDs alone, for a duration of no more than three months.

(Decl. Ex. 20 at 3 (Zuacta product monograph).)  Pursuant to the License Agreement, Sanofi Canada paid Winston $1.75 million (CAD) and Winston transferred its Canadian regulatory file to Sanofi Canada, to undertake commercialization of the Product.

On December 9, 2010, Health Canada approved the marketing and sale of the product under the brand name "Zuacta." (Decl. Ex. 21 (Dec. 9, 2010 Notice of Compliance).)

On July 18, 2011, Sanofi Canada entered into a Distribution and Supply Agreement with non-party Valeant International (Barbados) SRL ("Valeant"), under which Valeant agreed to commercialize, market, and sell Zuacta in Canada as Sanofi Canada's exclusive distributor. (Decl. Ex. 24 (July 18, 2011 Distribution and Supply Agreement).)

███████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

█████████████████

████████████████████████████████████████

███████████████████████████████████

### 3. Elorac Files This Lawsuit In March 2014

Elorac filed suit on March 17, 2014 (ECF No. 1) and served Sanofi Canada on July 2, 2014. Elorac has amended its complaint twice, and its *ad damnum* has increased from $20 million (USD) to at least $360 million (USD) in damages. Elorac's claim for worldwide damages is supported entirely by Dr. Walton's calculations and resulting opinion.

Sanofi Canada intends to seek enforcement of the limitation-of-liability provision (Decl. Ex. 9 at § 13.4 (License Agreement)), which enforcement would preclude Elorac's claims for damages based on alleged lost profits in Canada or the "lost opportunity" to market and sell Zuacta elsewhere around the world. In the meantime, Sanofi Canada will address Dr. Walton's speculative consequential damages opinion.

**B.** **DR. WALTON'S OPINION REGARDING ELORAC'S LOST PROFITS AND CONSEQUENTIAL DAMAGES**

**1.** **Qualifications**

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

**2.** **Summary Of Dr. Walton's Damages Opinion**

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████

**3. Assumptions**

**4.     Methodology**



Dr. Walton's damages opinion is wildly speculative, is not based on sufficient facts and data, and is not the product of reliable principles and methods. The Court should exclude Dr. Walton's proffered opinions under Federal Rule of Evidence 702 as construed by *Daubert* and its progeny.

## ARGUMENT

Federal Rule of Evidence 702 governs admissibility of expert opinion testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is a product of reliable principle and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

It is well-settled that the Court plays a "vital 'gatekeeping' role" to ensure "that only helpful, legitimate expert testimony reaches the jury" pursuant to "Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)." *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 771-72 (7th Cir. 2014).

Elorac bears the burden of establishing that its tendered expert satisfies these standards. *See id.* at 772. An expert must have "superior knowledge, skill, experience, or education with the subject matter of [his] testimony." *Padilla v. Hunter Douglas Window Coverings, Inc.*, 14 F. Supp. 3d 1127, 1132 (N.D. Ill. 2014). But "experience without reliable, testable methodology is not sufficient." *Brown,* 765 F.3d at 776 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146

(1997)).  To be admissible, an expert's opinion must be "based upon sufficient facts or data" and "the product of reliable principles and methods" that have been applied "reliably to the facts of the case."  *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 418 (7th Cir. 2005) (quoting Fed. R. Evid. 702); *see also Brown*, 765 F.3d at 773 ("[A]n expert must do more than just state that she is applying a respected methodology; she must follow through with it.").[4]

The Seventh Circuit has held that "optimistic" and "implausible" assumptions render a damages opinion unreliable when the record does not corroborate the assumptions.  *Target Market Publ'g, Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1144 (7th Cir. 1998); *see also Victory Records, Inc. v. Virgin Records Am., Inc.*, No. 08 cv 3977, 2011 WL 382743, at *1 (N.D. Ill. Feb. 3, 2011) ("[I]f the 'principal assumptions' underlying [an expert's] opinions lack the reliability expected by experts in the field, his lost profits calculations do not satisfy Rule 702."); *cf. Nolan v. United States*, No. 12 cv 247, 2015 WL 5159888, at *7 (N.D. Ill. Sept. 1, 2015) ("In short, guesswork, subjective impressions, or conjecture are not methods that are widely accepted in the scientific community when making causation determinations.").  "[O]pinion evidence which is connected to existing data only by the *ipse dixit* of the expert" is inadmissible; "a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Target Market Publ'g*, 136 F.3d at 1144 (quoting *Gen. Elec. Co.*, 522 U.S. at 146).

The Supreme Court has held that an expert must "employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  Likewise, the Seventh Circuit instructs district courts to exclude testimony that is "courtroom science" that does not "adhere to the same

---

[4] Expert testimony must also "assist the trier of fact in understanding the evidence or determining a fact in issue." *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) ("An expert must testify to something more than what is obvious to the layperson.") (internal quotations omitted).

standards of intellectual rigor that are demanded in their professional work." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318-19 (7th Cir. 1996); *Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 818 (7th Cir. 2010) (finding testimony unreliable where the expert "was not being as thorough as he might otherwise be" absent the "constraints litigation placed upon [his] methods and professional judgment").

Under these standards, Dr. Walton's opinion is not admissible.

## I.     DR. WALTON'S DAMAGES OPINIONS SHOULD BE EXCLUDED BECAUSE THEY ARE BASED ON HIS *IPSE DIXIT*, AND NOT BASED ON SUFFICIENT FACTS OR DATA

### A.     Dr. Walton's Theory On Causation And His Lost Profits Opinion Have No Basis Beyond Dr. Walton's *Ipse Dixit*

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ He theorizes that if Sanofi Canada had achieved sales of ███████████████ after launch, Elorac would have successfully found licensing and commercialization partners, who would have financed and accomplished worldwide regulatory approval for sale of Zuacta in the U.S., Europe, and Japan.

It is well-understood that a "thesis" is just a theory until it is proven true or false through commonly accepted methodology and testing. Dr. Walton's thesis, however, was never tested.

Indeed, Dr. Walton's ████████████████ target does not arise from a common, objective, or peer reviewed standard regarding the threshold at which an innovator is assured worldwide licensing deals and breeze-easy regulatory approval. Nor does Dr. Walton explain how a ██ ████████████████ threshold to attract worldwide investors is tied to his actual experiences. Instead, Dr. Walton admits he cherry-picked the ████████████████ number from an internal sales projection in a Sanofi Canada document.

Herein starts Dr. Walton's flawed analysis. His baseline standard, upon which the remainder of his theory rests, is "the" standard only by his own say-so, his *ipse dixit*. In *Kumho Tire*, the plaintiff's tire expert examined the tire in question for defects, and opined that the tire was defective, under his own methodology of reviewing four factors, and concluding the tire was defective if at least two of the factors were present. *Kumho Tire*, 526 U.S. at 144. The tire expert's methodology was unfounded, supported by neither standard in the industry nor his own experience. *Id.* at 157-158. Rather, the tire expert's opinion that his methodology for testing the tire was reliable was based purely on his *ipse dixit*. *Id.* at 157.

Here, Dr. Walton is the tire expert in *Kumho Tir*e. He espouses no support that his ██ ████████ threshold was derived from commonly accepted calculations in the field of economics or finance, and he cannot even claim experience to support his theory. Rather, the baseline of █████ in sales to attract worldwide investors is the baseline *because he says so*.

Dr. Walton's entire opinion should be excluded on this basis alone.

Dr. Walton's thesis is additionally unreliable because of his grand assumptions that upon achieving ████████, Elorac would have successfully partnered, financed, and achieved expedited regulatory approval around the world. Dr. Walton has not sufficiently tied his belief in these assumptions to his own specific experience, but makes a general claim that all of Elorac's "but for" success would have happened based on his experience in the pharma industry.

Where an expert relies on experience, the expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Chateau Vill. N. Condo. Ass'n v. Am. Family Mut. Ins. Co.*, No. 14 cv 01583, 2016 WL 1444626, *1 (D. Colo. Apr. 13, 2016) (quoting *United States v. Medina-Copete*, 757 F.3d 1092, 1096 (10th Cir. 2014)). "Of particular relevance to an

expert proffered for his experience, '[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support.'" *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003).

Here, Dr. Walton does not explain how his experience leads to his remarkable conclusion that achieving a ███████████ threshold in Canada would have resulted in worldwide success—in approximately two to three years. He was unable to offer any examples of similar experiences that would support his opinion that Elorac would have realized massive profits "but for" Zuacta sales in Canada that failed to reach ███████████. His assumptions are nothing more than speculation.

Moreover, his assumptions are directly contrary to the undisputed facts of this case. Expert testimony should be excluded if it "amount[s] to abstract conclusions not adequately grounded in the facts of the case." *El Aguila Food Prods., Inc. v. Gruma Corp.*, 131 F. App'x 450, 454 (5th Cir. 2005). "In determining admissibility of expert testimony, a court must also assess whether the testimony is sufficiently rooted in the facts of the case at issue to enable it to assist the jury's resolution of a factual dispute." *R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*, 99 cv 1174, 2004 WL 1613563, at *9 (N.D. Ill. July 19, 2004). "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).

In the context of experts opining on damages, an expert's testimony that does not "incorporate all aspects of the economic reality of the [relevant] market" lacks adequate foundation and is mere speculation. *Concord Boat Co. v. Brunswick Corp.*, 207 F.3d 1039, 1057

(8th Cir. 2000); *see also N. States Power Co. v. City of Ashland, Wis.*, No. 12 cv 602, 2015 WL 1745880, *3 (W.D. Wis. Apr. 16, 2015) (holding that experts may not base their opinions on "mere speculation"); *Scott v. Chuhak & Tecson, PC*, No. 09 cv 6858, 2011 WL 4462915, at *5 (N.D. Ill. Sept. 26, 2011) (striking expert testimony based on assumptions "that [were] contradicted by undisputed evidence").

Contrary to Dr. Walton's assumptions, there were many demonstrable reasons that pharmaceutical companies historically rejected Zuacta— ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

Long after Zuacta was launched, Elorac continued to unsuccessfully solicit licensing partners, and none rejected the opportunity because of allegedly poor sales in Canada. ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████

        ████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████

This is a glib observation that ignores his expert responsibilities. Under Seventh Circuit precedent, in order for his opinion to be reliable, Dr. Walton needed to account for the myriad of obvious alternative causes █████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████ *See Brown*, 765 F.3d at 773 ("[T]he district court has discretion to consider whether the expert has adequately accounted for obvious alternative explanations.").

In sum, Dr. Walton's opinion fails to meet *Daubert* standards of admissibility. His thesis is not supported by acceptable methodology or by his experience. Rather, his thesis supported only by Dr. Walton's *ipse dixit*. His underlying assumptions are contrary to record evidence, which Dr. Walton chose to ignore instead of reconciling.

Dr. Walton's damages opinion should be excluded.

**B.**     **Dr. Walton Is Unqualified To Make Assumptions About The Ability Of Elorac To Achieve Rapid Worldwide Regulatory Approval**

Zuacta cannot legally be marketed in the United States, Europe, or Japan. █████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████

Dr. Walton's admitted non-expertise renders his regulatory opinions (indeed, assumptions) inadmissible as a matter of law. *See Padilla*, 14 F. Supp. 3d at 1132; *see also Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) ("The question [the Court] must ask is not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for him to answer a specific question . . . [The Court] must look at each of the conclusions he draws individually to see if he has the adequate education, skill, and training to reach them.") (internal quotation omitted).

Additionally, his rapid worldwide regulatory approval assumption flies in the face of the actual record evidence. The FDA rejected Elorac's application because it required a "2-year dermal carcinogenicity stud[y]" in order to "evaluate the safety of this chronically administered drug." (Decl. Ex. 17 at 1 (Aug. 30, 2010 FDA "Refusal to File" letter).) Apparently, Dr. Walton assumes in his model that the FDA would reverse itself and waive the need for this two-year study. Dr. Walton does not account for this two-year study in his damages timeline.

Dr. Walton is not qualified to opine on regulatory issues, in the U.S., Europe or Japan. His inability to opine on regulatory approval (much less support his fantastic belief that worldwide approval would be achieved in a two-year period) renders his whole calculus unreliable and inadmissible.

C.   **Dr. Walton's Use Of An Internal Sanofi Canada Forecast To Calculate Foreign Lost Profits Is Unreliable And He Admits It Fails To Satisfy His Own Standards In Everyday Practice**

Once Dr. Walton arbitrarily sets ███████████ as his theoretical trigger for worldwide success, and assumes it would have led to securing worldwide partners and regulatory approval for sale, Dr. Walton calculates the amounts of lost profits.

███████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████ This aspect of

Dr. Walton's analysis is equally unreliable as his premise and underlying assumptions, for

several reasons.

First, it is wholly improper for an expert to rely upon a party's internal projections instead

of conducting independent and rigorous analysis. Rather, an expert must scrutinize projections

because many "internal projections . . . represent hopes rather than the results of scientific

analysis." *Zenith Elecs.*, 395 F.3d at 420 (rejecting expert testimony that extrapolated from

internal projections); *Target Market Publ'g*, 136 F.3d at 1144-45 (rejecting expert's calculation

of lost sales as being "optimistic" given poor actual performance, despite the claim that the

expert relied on the defendant's own projections); *see Infinicon, Inc. v. Verionix, Inc.*, ___ F.

Supp. 3d ___, 2016 WL 1611379, at *3 (S.D.N.Y. 2016) ("A defendant's own projections cannot

satisfy the requisite level of certainty in situations involving a new product with relatively little

sales history."); *TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 636-37 (7th

Cir. 2007) (rejecting evidence of lost profits derived from the defendant's pre-contract sales

projections); *cf. Victory Records*, 2011 WL 382743, at *2 ("The Seventh Circuit has held,

however, that an assumption based on the internal projections of the expert's sponsor lacks the

reliability demanded by Rule 702.").

Second, even if he were permitted to adopt someone else's analysis (and he is not), Dr.

Walton did not attempt to confirm Sanofi Canada's internal projections. ████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

Evaluating the value of the pharmaceutical product by cherry-picking an internal forecast from another company, and neglecting to confirm its accuracy, is not the standard within the industry. ███████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████

███████████████████████████████ "[E]ven a lawyer knows enough to insist that experts follow scientific approaches normal to their disciplines." *See Zenith Elecs.*, 395 F.3d at 419. That is not what Dr. Walton has done. *See also Kumho Tire*, 526 U.S. at 152 (requiring "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Am. Honda*, 600 F.3d at 818 (requiring ordinary thoroughness); *Rosen*, 78 F.3d at 318-19 (requiring intellectual rigor).

Third, Dr. Walton also ignores an expert's mandate to be on high alert when calculating lost profits for new products. Courts are inherently suspicious and apply a heightened scrutiny where damages are based on a new product being sold in new geographies. *Infinicon*, 2016 WL 1611379, at *4 ("'[T]here is no track record upon which to base an estimate' of future sales or

profits."); *see also TAS Distrib. Co., Inc.*, 491 F.3d at 635 ("[P]ast successes with similar products . . . do not provide sufficient information from which to calculate lost profits on a new product."). ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ Thus, Dr. Walton seeks to use Canadian forecasts that he does not understand as a way to extrapolate sales in foreign markets that are heavily regulated and distinct from one another.

Finally, Dr. Walton's excuse for his unreliable assumptions and failure to independently analyze the data should be rejected. ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████ Dr. Walton's explanation for extending peak sales in each territory is pure *ipse dixit*. This is especially true of his "model" for sales in Japan. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

Dr. Walton's use of an internal Sanofi Canada forecast to calculate worldwide lost profits is unreliable. His opinion should be excluded.

## II. DR. WALTON'S DAMAGES OPINION SHOULD BE EXCLUDED BECAUSE HE IS UNQUALIFIED TO SELECT BENCHMARKS FOR EVALUATING PEAK SALES

Under Dr. Walton's theory, once the ███████████ threshold was met, Elorac would find commercialization partners, and Zuacta would obtain worldwide regulatory approval and generate $2 billion (USD) in sales. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████

Under *Daubert*, Dr. Walton must be careful to "select samples that are truly comparable." *Loeffel Steel Prods. Inc. v. Delta Brands, Inc.,* 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005); *see also Victory Records*, 2011 WL 382743, at *4 ("[T]he expert's samples should have been chosen using some method that assures the samples are appropriately representative of the plaintiff's business.") (internal quotation omitted).

As an initial matter, Dr. Walton's use of this methodology to extrapolate damages in Europe is wanting because he does not identify any benchmarks in that market. ██████████

████████████████████████████████████████████

██████████████████

More importantly, Dr. Walton is not medically qualified to judge the products' equivalence. Dr. Walton lacks the specialized, clinical, or scientific expertise necessary for him to reliably determine that Zuacta is truly comparable to his benchmarks for purposes of predicting peak sales performance. Dr. Walton should have consulted with doctors and

pharmacists to determine how the market perceived the similarities and differences between Zuacta and his benchmarks █████████████████████

Where, as here, the "record fails to establish that [the expert] developed any particular expertise" related to the specific testimony, the testimony is inadmissible. *See Padilla*, 14 F. Supp. 3d at 1133; *see also Gayton*, 593 F.3d at 617 (affirming exclusion of portions of an expert's opinion that exceeded the expert's areas of expertise).

## III. DR. WALTON'S CALCULATION OF CANADIAN-BASED DAMAGES WILL NOT ASSIST THE TRIER OF FACT BECAUSE HIS OPINION IS BASED ON BASIC MATH

Although Dr. Richard Manning is Elorac's principal Canadian damages expert, Dr. Walton performs a basic calculation of present-value Canadian damages. █████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

Dr. Walton's testimony draws not on his purported expertise, but rather on how accurately he transcribed numbers into an excel spreadsheet. "An expert . . . must testify to something more than what is obvious to the layperson in order to be of any particular assistance to the jury." *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) (internal quotation omitted). Having Dr. Walton calculate royalties of 12% that would be due based on Sanofi Canada's internal "hopes," *Zenith Elecs.*, 395 F.3d at 420, is a transparent and improper attempt to lend *gravitas* to an otherwise straightforward (but nonetheless flawed) calculation. *See Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415 (7th Cir. 1992) (critiquing the practice of "enduing of simplistic extrapolation and childish arithmetic with the appearance of authority by hiring a professor to mouth damages theories that make a joke of the concept of

expert knowledge"). Accordingly, he should not be permitted to testify regarding Canadian damages.

## CONCLUSION

For all of the foregoing reasons, sanofi-aventis Canada Inc. respectfully requests that the Court grant this motion and enter an order excluding the testimony of Dr. Edward Fintan Walton in its entirety.

**Dated**: August 25, 2016

SANOFI-AVENTIS CANADA INC.

By: /s/ *Christopher M. Strongosky*

| | |
|---|---|
| Raj N. Shah (ARDC # 6244821) | Christopher M. Strongosky (*admitted pro hac vice*) |
| Eric M. Roberts (ARDC # 6306839) | Leeanne S. Mancari (*admitted pro hac vice*) |
| DLA Piper LLP (US) | DLA Piper LLP (US) |
| 203 North LaSalle Street, Suite 1900 | 1251 Avenue of the Americas |
| Chicago, Illinois 60601-1293 | New York, New York 10020 |
| (312) 368-4000 (p) | (212) 335-4500 (p) |
| (312) 236-7516 (f) | (212) 335-4501 (f) |
| raj.shah@dlapiper.com | christopher.strongosky@dlapiper.com |
| eric.roberts@dlapiper.com | leeanne.mancari@dlapiper.com |