**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ELORAC, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 14-cv-1859** |
| | ) | |
| **v.** | ) | **Jury Demanded** |
| | ) | |
| **SANOFI-AVENTIS CANADA INC.** | ) | **Hon. Jorge L. Alonso** |
| | ) | |
| **Defendant.** | ) | |

**ELORAC'S RESPONSE BRIEF IN OPPOSITION TO SANOFI'S**
**MOTION TO EXCLUDE TESTIMONY OF DR. EDWARD FINTAN WALTON**

Plaintiff, Elorac, Inc. ("Elorac"), by its undersigned counsel, hereby submits this response brief in opposition to the motion to exclude the testimony of Dr. Edward Fintan Walton ("Dr. Walton") in its entirety filed by sanofi-aventis Canada Inc. ("Sanofi").

## I. INTRODUCTION

Sanofi is desperate to have the Court exclude Dr. Walton's testimony as to Elorac's lost opportunity royalty and milestone revenue stream from prospective licensees of the Product in the United States, Europe and Japan resulting from Sanofi's gross negligence, willful misconduct and material breaches of the License Agreement. Sanofi relies on *Zenith Electronics* to argue that the Seventh Circuit prohibits experts opining on lost profits damages from relying upon a party's internal sales projections. This is not true. *Zenith Electronics* merely held that WH-TV's estimates of lost profits based on WH-TV's own internal sales projections were not admissible as lay opinion through its business managers. The Seventh Circuit in *Zenith Electronics* did not *per se* exclude experts opining on lost profit damages from relying upon the adverse party's pre-litigation internal financial projections. Numerous Courts in this District have expressly held since the Seventh Circuit's decision in *Zenith Electronics* that where, as here, an expert provides

support for his reliance on a party's internal financial projections, the opinion does need not be excluded, and the opposing party may instead test the expert's reliance on the internal financial projections through cross-examination.

Dr. Walton relies in part upon Sanofi's internal financial projections as the basis for his lost opportunity royalty and milestone revenue stream estimates. These are not some "back-seat" projections created by an over-zealous entrepreneur or amateur with no background in projecting future financial projections; rather, these financial projections were created by a sophisticated pharmaceutical company, Sanofi, based on detailed market and medical research and surveys.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████     ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████ With the seal of approval from *two giant pharmaceutical companies*, the financial projections are not mere hopes but extremely reliable projections created by Sanofi to which Dr. Walton is entitled to rely.

Contrary to Sanofi's contention, Dr. Walton did not admit tha████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

[1] ████████████████████████████████████████████████████████
████████████████████████████  █  █  ████████████

████████  ████  █████████████████████████████████████
████  ███  ███████████████████████████████████████████
███████████████████████████████████████████████  Dr. Walton
could have selected the highest financial projections upon which to construct his damages model
but he chose the lowest projections in order to be extremely conservative.

The facts of *Zenith Electronics* also are distinguishable for numerous reasons. First, Dr.
Walton applied a benchmark analysis in this case, a well-established method used by damages
experts. Second, based on his experience he independently selected Pennsaid, Voltaren and
Loqoa Tape as the appropriate analogs in particular geographic markets. Dr. Walton has years of
extensive experience in the biopharmaceutical industry on which to base such determinations. In
addition, Elorac's commercially reasonable experts (Robert Baldini and Dr. Purohit) and
damages expert for actual damages in Canada (Dr. Manning) also identify Pennsaid as an
appropriate analog to Zuacta. Further, █████████████████████████████████
███████████████████████████████████████████████████████

Accordingly, the Court should deny Sanofi's motion to exclude and admit Dr. Walton's
testimony in its entirety.

## II.     DR. WALTON'S EXPERIENCE

Dr. Walton has more than 30 years' experience in the biotechnology and pharmaceutical
industry, both as a practising scientist in the biopharmaceutical industry and a business
consultant to corporations worldwide, specializing in pharmaceutical product evaluations,
licensing, deal structuring, valuation, and the negotiation of license agreements. *See* Ex. 1
(Raver Aff. (09/28/16)) at Ex. A (Walton Dep. T. (06/10/16)) at 18-19. *See also id.* at Ex. B
(Walton Report) at App. 1 (CV). Throughout his several decades in the pharmaceutical industry,

Dr. Walton has performed over 700 consultancy assignments for more than 180 companies worldwide, many of which have concerned the Canadian marketplace. *See id.* at Ex. A at 33-34.

Dr. Walton received a B.A. (1977) and Ph.D. (1982) in Genetics from the University of Dublin, Trinity College, and he undertook post-graduate research at the University of Michigan regarding "mutations that affect the cell division cycle of *Saccharomyces cerevisiae.*" Ex. 1 at Ex. B. For ten (10) years, Dr. Walton worked as a geneticist in private industry, first genetically manipulating yeast and later working on "[d]evelopment of gene expression systems, cloning and expression of therapeutic relevant genes" at Celltech Ltd., where he was the Head of Gene Cloning. *Id. See also* Ex. 1 at Ex. A at 19. While at Celltech, Dr. Walton was also involved in the business side of pharmaceuticals and biotech, including the negotiation and execution of license agreements. *See* Ex. 1 at Ex. A at 19-22.

In 1992, Dr. Walton co-founded CONNECT Pharma Ltd., a company that specialized in advising international companies on licensing and business development in the pharmaceutical and biotech industries as well as publishing and producing business reports and commercial databases for both small and major corporations worldwide. *See id.* at 23. *See also id.* at Ex. B. Dr. Walton served as the Chief Executive for four (4) years and his ███████████████

███████████████████████████████████████████████████████

████████████████████████████████████" *Id.* at Ex. A at 23-24. *See also id.* at Ex. B. While at CONNECT Pharma, Dr. Walton launched a database called PharmaDeals, which "████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████" *Id.* at Ex. A at 25. The quality of PharmaDeals is reflected by the fact that it was later sold to the leading healthcare information

and consulting company, IMS Health.  *See id.*

Since 1997, Dr. Walton has served as the Chief Executive of PharmaVentures Ltd. in Oxford, United Kingdom, a consulting and corporate advisory company providing valuations of pharmaceutical deal terms to clients around the world.  *See id.* at 25-26.  PharmaVentures provides " ███████████████████████████████████████████████████████████ ███████████████████ "  *Id.* at 26.  PharmaVentures also provides the following services to global clients:  "business and corporate strategy, strategic alliances, alliance management, licensing, business development, commercial assessments, market research, product and technology valuations, business and financial modelling, [and] determining and advising deal terms."  *Id.* at Ex. B.  In addition to its considerable insight into licensing agreements through its hundreds of consultancy assignments, PharmaVentures uses a database called "ReCap" – owned an produced by global information and publishing company Thompson Reuters – to access publicly available license agreements.  *Id.* at Ex. A at 27.

Dr. Walton has " ████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████ "  *Id.* at 34-35.  Dr. Walton's company recently assisted a Canadian company, ███████████████████████████████████████████████████████████ ███████████████████████████████  *Id.* at Ex. A at 35.  Dr. Walton has extensive experience in pharmaceuticals in the pain market, like Zuacta in the instant case.  *See id.* at 36. ███████████████████████████████████████████████████████████ ████████████████████████████  *See id.* at 36-37.  ████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████

*Id.* 37.

In addition to his vast experience in the pharmaceutical industry, Dr. Walton has published more than fifty (50) articles in the past twelve (12) years regarding the pharmaceutical industry. *Id.* at Ex. B. He has led training workshops on negotiating and valuing license agreements across the world. *See id.*

### III.    ARGUMENT

#### A. *Daubert* Standards.

Federal Rule of Evidence 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience. *See, e.g.*, *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 590-91 (7th Cir. 2000). The court should consider an expert's "full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). There must only be "a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *U.S. v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). As such, "[a]nyone with relevant expertise enabling him to offer reasonable opinion testimony helpful to judge or jury may qualify as an expert witness." *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000).

Reliability is the question for admissibility; accuracy is the question for cross-examination: "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Smith*, 215 F.3d at 718. "Determinations on *admissibility* should not supplant the adversarial process; 'shaky' expert testimony may be *admissible*, assailable by its opponents through cross-examination." *Gayton v. McCoy*, 593 F.3d 610, 616

(7th Cir. 2010) (emphasis added). A district court's evaluation of expert testimony under *Daubert* should not "take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012).

**B. Sanofi's Motion To Exclude Dr. Walton's Testimony Should Be Denied Because They Are Based Upon Sufficient Facts And Data And Not His *Ipse Dixit*.**

Sanofi argues that the Court should grant its motion to exclude Dr. Walton's testimony in its entirety because Dr. Walton's theory on causation and his lost opportunity revenue opinions have "no basis beyond [his] *ipse dixit*" and Dr. Walton's use of an "internal Sanofi Canada February 2011 forecast" to calculate lost profits is unreliable, and because Dr. Walton is "not qualified to opine on regulatory issues" including his "belief that worldwide approval would be achieved in a two-year period." Dkt. # 276 at 14; 18-19. Sanofi's arguments are baseless.

**1. Dr. Walton's Actual Damages Opinions Are Based on Both Dr. Walton's Benchmark Methodology and Experience.**

Turning a blind eye to Dr. Walton's testimony, Sanofi argues that Dr. Walton's failure to apply a reliable methodology or to tie his opinions to his experience renders his opinions unreliable and inadmissible. *See id.* at 14-18; 19-23. Citing *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 419 (7th Cir. 2005), Sanofi contends that the Seventh Circuit prohibits experts from "rely[ing] upon a party's internal projections instead of conducting independent and rigorous analysis." Dkt. # 276 at 20. Sanofi is wrong on the law, and the facts of *Zenith Electronics* are clearly distinguishable.

**(a) Dr. Walton Did Not Admit that His Reliance on Sanofi's Internal Financial Projections Is Not Standard Within the Industry.**

Sanofi contends that Dr. Walton "confessed that he would never rely upon his methodology and assumptions for one of his clients if his client was actually looking to buy or sell the rights to Zuacta" and "admitted" that his reliance on Sanofi's internal financial pro-

jections is "not standard within the industry." Dkt. # 276 at 2; 21. These contentions are not true.

Sanofi mischaracterizes Dr. Walton's testimony by asserting that a damage analysis prepared after parties have negotiated an agreement and are in litigation should be the same analysis performed when parties are negotiating an agreement. The two situations, however, are starkly different, and this difference accounts for Dr. Walton's use of benchmark analysis in this case. Dr. Walton explained that ███████████████████████████████ ███████ ██ █████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████ ██ ████████████████████████ Dr. Walton specifically explained:



* * *

*Id.* at 178-79; 184-85. Sanofi mischaracterizes Dr. Walton's testimony, and hence the Court should reject Sanofi's argument and admit Dr. Walton's testimony in its entirety.

### (b) The Court in *Zenith Electronics* Did Not *Per Se* Prohibit Experts From Relying Upon Internal Projections, and the Case Is Inapposite.

In *Zenith Electronics*, Zenith filed suit to collect unpaid invoices for cable boxes it sold to WH-TV, a digital television broadcaster. *See Zenith Electronics*, 395 F.3d at 417. WH-TV filed a counterclaim against Zenith, claiming that it lost profits due to defects in Zenith's merchandise which WH-TV had intended to use in its digital services in a new and unique market of San Juan. *See id.* WH-TV's damages expert proposed to testify that had the boxes been non-defective, WH-TV "would have experienced rapid growth paralleling that of DirectTV, the leading satellite broadcaster." *Id.* at 418. WH-TV's damages expert's estimate had two parts: first, the number of customers in San Juan who would have subscribed to DirecTV from 2002 to 2008 and second, the percentage of those customers who would have used WH-TV instead had WH-TV been able to provide service better than that provided by Zenith's equipment. *See id.* The Court found that the damages expert might have based the first component on "DirecTV's actual sales in other markets, but he did not do so;" instead, the damages expert claimed that San Juan was "'unique' and that all experience in other markets is "irrelevant." *Id.* The Court also found that the damages expert as to the second component "made no effort to calculate the potential subscriber base or use data from other markets." *Id.*

The Court found that the proposed damages expert "all but conceded that he had not applied 'reliable principles and methods.'" *Id.* The Court noted that when asked what method he employed to "generate projections, [damages expert] repeatedly answered 'my expertise' or some variant ('my industry expertise', '[my] awareness,' and 'my curriculum vitae') – which is to say that he either had no method or could not describe one." *Id.* The Court held that "[the

expert] was relying on intuition, which won't do." *Id.* The Court noted that "tools to isolate the effects of multiple variables and determine how they influence" the sales of MMDS service exist and "[p]erhaps the leading tool is the multivariate regression [analysis]." *Id.* at 419. In affirming the District Court's decision excluding WH-TV's proffered expert testimony, however, the Court found that the "record contains nothing suggesting that [statistical tools] would have been inadequate if tried. Indeed, the record does not contain any hint why [damages expert] preferred intuition to the empirical toolkit of the social sciences." *Id.*

The Court also affirmed the District Court's decision excluding WH-TV's estimates of lost profits based on *WH-TV's internal projections* which set forth "per-subscriber valuations prepared in connection with the potential sales of the business", holding that *WH-TV's internal projections* were not admissible as *lay* opinion. *Id.* at 420. The District Court's decision reveals that WH-TV sought to "use its business managers to prove that WH-TV would have enrolled a specific number of future subscribers absent Zenith's breach." *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, No. 01 C 4366, 2003 WL 22284326, at *3 (N.D. Ill. Oct. 2, 2003). The District Court held that WH-TV's business managers could not provide "any opinions as to future sales to future customers" because such opinions are "necessarily based on market analysis" which requires "specialized knowledge" of an expert witness. *Id.* The District Court also held that WH-TV could not "offer to *its expert* a hypothetical number of future subscribers – based on nothing more than counsel's imagination" for the expert to "use that number to opine on lost future profits." *Id.* (emphasis added).

Not only is Sanofi wrong about the Court's holdings in *Zenith Electronics*, it also is wrong to rely upon *Zenith Electronics*, because the facts of that case are clearly distinguishable in several important respects. First, unlike the proffered expert in *Zenith Electronics* who either

10

"had no method or could not describe one," Dr. Walton applied a benchmark analysis which is an exceedingly well-established and acceptable damages method. *See* Ex. 1 at Ex. A at 157-59. Dr. Walton testified that ███████████████████████████████████████████ ████████████ ██ ██████████████████████████████████████████████ ████████████████████████████████████████████ ██ ██████

Numerous Courts, including ones in this District, have permitted the use of benchmark analysis by experts opining on lost profits in a variety of circumstances because "[g]enerally, there is no one method by which a plaintiff must establish lost profits with reasonable certainty." *Wilbern v. Culver Franchising System, Inc.*, No. 13 C 3269, 2015 WL 5722825, at *31 (N.D. Ill. Sept. 29, 2015) (permitting expert comparable analysis in discrimination case, finding that "historical data from franchise operations can be proper yardstick for losses sustained by a potential franchisee who was prevented from going into the franchise business by the wrongful conduct of the defendant"). *See also Orthofix, Inc. v. Gordon*, No. 1:13-cv-01463, 2016 WL 1273160, at *4 (C.D. Ill. Mar. 31, 2016) (denying defendant's motion in limine in breach of contract and trade secret misappropriation case, finding that accountant expert's use of "yardstick approach" for calculating lost profits was "acceptably reliable method" where expert selected proper comparable that served as an "accurate predictor[] of what the target would have done."); *TVT Records, LLC v. Island Def Jam Music Group*, 250 F.Supp.2d 341, 350 (S.D.N.Y. 2003) (denying defendant's motion in limine as to lost profits testimony in tortious interference with contract action, finding that expert properly applied a yardstick methodology to calculate the record company's projected future sales.

Second, the internal projections of future sales criticized by the Court in *Zenith Electronics* were prepared by counterclaim plaintiff, WH-TV, and not counterclaim defendant,

Zenith. *See Zenith Electronics*, 395 F.3d at 3. As explained above, the internal financial projections relied upon by Dr. Walton in connection with his benchmark analysis were prepared by Sanofi in the ordinary course of business, and not by Elorac. *See supra*. Also, WH-TV sought to use its *business managers* to prove that WH-TV would have enrolled a specific number of future subscribers absent Zenith's breach based on the internal projections. *Zenith Electronics,* 2003 WL 22284326, at *3. The District Court held that WH-TV's business managers could not provide "any opinions as to future sales to future customers are necessarily based on market analysis" which requires "specialized knowledge" of an expert witness. *Id.* As to WH-TV's damages expert, the District Court held only that WH-TV could not "offer to its expert a hypothetical number of future subscribers – based on nothing more than counsel's imagination" for the expert to "use that number to opine on lost future profits." *Id.* Here, Elorac's expert Dr. Walton, and not Elorac business managers offering lay opinions, relies upon financial projections prepared by Sanofi that Sanofi used to generate corporate approval for the Licensing Agreement and not a "projection of future subscribers concocted entirely from the imagination of counsel" and used those conservative projections and his knowledge and experience in global pharmaceutical markets to estimate sales in those markets if Sanofi had not destroyed the Product's viability by breaching the License Agreement. *Id.* at *4.

Third, unlike the expert in *Zenith Electronics* who did not rely on competitor DirecTV's sales in other markets because of the alleged unique nature of the San Juan market, Dr. Walton does not testify about a theoretical or a unique market, but based on his vast experience and knowledge of actual markets Dr. Walton specifically selected appropriate benchmarks for the Product – Pennsaid, Voltaren, Diractin and Loqoa Tape – to determine potential licensing and milestone revenue achievable for the Product in major well-defined markets – the United States,

Europe and Japan – if Sanofi had performed its obligations pursuant to the License Agreement and generated a reasonable level of Product sales in Canada. Thus, the Court should reject Sanofi's argument that *Zenith Electronics* prohibits damage expert opinions on lost opportunity revenue streams from relying upon internal financial projections and admit Dr. Walton's testimony in its entirety.

###### (c) Numerous Courts in This District Have Held that Expert Testimony Is Not Excludable Where An Expert Provides Support for His Reliance on Internal Projections.

The Seventh Circuit in *Zenith Electronics* did not *per se* exclude the use of internal projections as a basis for an expert's damages opinion, because numerous Courts in this District have expressly held since the Seventh Circuit's decision in *Zenith Electronics* that where, as here, an expert "provides support for his reliance on a party's internal projections, the opinion need not be excluded, and the opposing party may instead test the expert's reliance on the internal projections through cross-examination." *See Smart Marketing Group, Inc. v. Publications Int'l, Ltd.*, No. 04 C 146, 2014 WL 624933, at *3 (N.D. Ill. Feb. 18, 2014) (denying defendant's motion *in limine*, finding that damages expert has "taken steps that validate – at least in his opinion – that the Management Projections [created by plaintiff] provide a reasonable basis for the lost profits calculation he performed and has explained his reasoning in his report and deposition."). *See also System Dev. Integration, LLC v. Computer Sciences Corp.*, 886 F.Supp.2d 873, 884 (N.D. Ill. 2012) (denying defendant's motion to exclude the testimony of plaintiff expert damages witness, finding that it was permissible for damages expert to "base[] his lost profits calculations on the volume and rate information provided in the subcontractor agreement" where expert "credibly explained" that he viewed volumes and rates in the

13

subcontract as "'parties' best expectation of what the volumes and applicable rates would be, which is best estimate of revenue that [he] could derive.'").

LG Electronics U.S.A., Inc. v. Whirlpool Corp., No. 08 C 242, 2010 WL 3397358 (N.D. Ill. Aug. 24, 2010) is instructive. In this case, plaintiff's damages expert submitted a lost profits opinion based upon "several Whirlpool documents that shows that consumers' preference for steam is a key driver of sales of Whirlpool's dryers." Id. at *4. "After determining that consumers prefer steam and that they can distinguish between steam and mist, [expert] also opined, again based on Whirlpool documents, that Whirlpool gained market share and LG lost market share when Whirlpool began selling its steam dryer" and opined that there was a "causal link between Whirlpool's false advertising and the damages sustained by LG." Id. The damages expert testified that he "could quantify consumer preference for steam as compared to mist based on research that Whirlpool conducted and that he did not conduct his own surveys with regard to this information because Whirlpool had already conducted the relevant surveys." Id. The Court found that "[s]ignificantly, [expert] relies on documents from Whirlpool's, not LG's files." Id. at *6. The Court also found that the expert's reliance on Whirlpool's "forecasts of sales projections prior to the launch of its dryer" permissible because the expert explained at length the reasons why "he employed the forecasts to arrive at the 18 percent figure because Whirlpool did not have actual historic sales figures for the steam dryer which had just launched" to conduct his lost profits analysis. Id. at *6-7. The Court denied defendant's motion to exclude and held that plaintiff established that its damages expert "applied a reliable methodology in this regard, and Whirlpool's criticisms go to the weight, and not the admissibility, of [expert's] opinions and testimony." Id. at *7.

Like LG's damages expert in *LG Electronics*, Dr. Walton relies upon Sanofi's internal financial projections as a basis for his lost opportunity revenue opinions. █████████ ██████████████████████████ ██ ████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████ ███████ ███████████████████████████████████████████ ██████████████████████████████████████████.

████████████████████████████████████ ███████████████████████████████████████ █████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████████ █████████████████

███████████████████████████████████████████ ███████████████████████████████████████████ █████████████████████████████████████████████.

Dr. Walton views Sanofi's own internal financial projections as reliable because █████ █████████████████████████████████ ██ ███ ███████████████████████████████████████████ ██████████████████████████████ ██ ██████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████ ██ ██████████████████████████████████ ██████ ██████ █████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████. As was the case with the stream dryer in *LG Electronics*, Zuacta was launched (and disastrously so) for an extremely short amount of time, leading to the destruction of the market for Zuacta both in Canada and other markets. Thus, the Court should reject Sanofi's argument and admit Dr. Walton's testimony in its entirety.

### (d) Dr. Walton's Assumptions Are Not Contrary to the Undisputed Facts of this Case.

Relying on certain email correspondence, Sanofi argues that "████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ Dkt. # 276 at 17. Sanofi's reliance on a handful of e-mails is misplaced and, in any event, irrelevant.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ █

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

[REDACTED]

Equally unpersuasive is Sanofi's reliance on a few other e-mails that it argues reflect that

[REDACTED]

Sanofi ignores such e-mails, which corroborate Dr. Walton's testimony that potential



*Id.* at 348 (emphasis added). Dr. Walton further criticized Dr. Guha by explaining that:



*Id.* at 362; 364-65 (emphasis added). Thus, the Court should reject Sanofi's argument and admit Dr. Walton's testimony in its entirety.

### (e) Dr. Walton's Assumptions Are Not Unreliable.

Sanofi argues that "Dr. Walton's explanation for extending peak sales in each territory [for an additional few years] is pure *ipse dixit*" especially as to his "'model' for sales in Japan." Dkt. # 276 at 22. This is nonsense. Dr. Walton testified that after reaching peak sales, Zuacta sales would remain constant at peak levels for certain periods of time. *See* Ex. 1 at Ex. A at 52.

As to extending peaks sales in the United States, EU and Japan by three additional years, Dr. Walton testified that:



*Id.* at 395-96.  As to Japan in particular, Dr. Walton clearly testified that ██████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████

████████████████ *Id.* at 214

Not only does Sanofi fail to cite relevant testimony by Dr. Walton clearly articulating the bases for his additional years of peak sales in these territories, Sanofi also ignores that Dr. Walton's damages model is truly "conservative." ████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ██ ████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████ *Id.* at 192-93.  Thus, the Court should reject Sanofi's argument and admit Dr. Walton's testimony in its entirety.

## C. Dr. Walton Is Qualified to Make Assumptions About the Ability of Elorac to Achieve Worldwide Regulatory Approval.

Sanofi contends that Dr. Walton is not qualified to make assumptions about the ability of Elorac to achieve "rapid worldwide regulatory approval" because Dr. Walton "admitted" he is not a regulatory expert. Dkt. # 276 at 18-19. Sanofi's argument is meritless.

First, Dr. Walton testified that Health Canada's approval of Zuacta would assist with securing approvals in other markets. Dr. Walton explained ██████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████ Ex. 1 at Ex. A at 52. He testified that █████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████[2] *Id.* at 64-65.

Next, Dr. Walton specifically testified that his assumption that the outcome of clinical studies required by the United States, European Union and Japan would ████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ Ex. 1 at Ex. A at 69-70. Dr. Walton also explained that:



────────────────────────
[2] ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████



*Id.* at 71-72. Dr. Walton testified that ████████████████████████████████████
████████████████████████████████████████████████████ ██ ███████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
██████████████████████████████████████████ *Id.* at 364-66.

Finally, Dr. Walton's two-year "worldwide regulatory approval assumption" does <u>not</u> fl[y] in the face of" the FDA's "required '[] 2-year dermal carcinogenicity stud[y]' in order to 'evaluate the safety of this chronically administered drug.'" Dkt. # 276 at 19. ████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████

████████ Thus, the Court should reject Sanofi's argument and admit Dr. Walton's testimony in its entirety.

**D. Sanofi's Motion To Exclude Dr. Walton's Testimony Should Be Denied Because He Is Qualified To Select Benchmarks For Evaluating Peak Sales.**

Sanofi argues that the Court should grant its motion to exclude Dr. Walton's testimony because he is "not medically qualified to judge the . . . equivalence" of Pennsaid, Voltaren and Loqoa Tape in order to identify these products as "'benchmark' comparators" to Zuacta. Dkt. # 276 at 23. Sanofi's argument is meritless.

First, as detailed in Section II *supra*, Dr. Walton has extensive experience in the biotechnology and pharmaceutical industry, specializing in pharmaceutical product evaluations, licensing, deal structuring, valuation, and the negotiation of license agreements which renders him abundantly qualified to identify Pennsaid, Voltaren, Diractin and Loqoa Tape as benchmarks to Zuacta. *See* Ex. 1 at Ex. A at 18-19. *See also id.* at Ex. B.

Second, Dr. Walton independently determined that Pennsaid, Voltaren, Diractin and Loqoa Tape are appropriate analogs to Zuacta. During his deposition, Dr. Walton testified that

███████████████████████████████████████████████████████████████

████████████████████████ ██ ████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████ ██ ██████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████ *Id.* at 162.

Sanofi's argument that Dr. Walton "should have consulted with doctors and pharmacists to determine how the market perceived the similarities and differences between Zuacta and his benchmarks" is meritless. Dkt. # 276 at 23-24. As shown above, Dr. Walton has extensive pharmaceutical licensing negotiation and deal expertise to render an opinion that Pennsaid,

Voltaren, Diractin and Loqoa Tape are the appropriate analogs to Zuacta for purposes of a benchmark analyses. *See supra.* Also, Dr. Walton testified in addition to performing independent research he ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████ ██ ██████████████

████████████████████████████████████████

███████████████████████████ ██ ██████████

Further, Dr. Walton is not the only expert retained in this case who has opined that Pennsaid is an appropriate analog to Zuacta. Both Elorac's commercialization experts, Robert E. Baldini and Dr. Ahnal Purohit, and Elorac's Canadian damages expert, Dr. Richard L. Manning, have testified that Pennsaid is an appropriate analog to Zuacta. ████████████████████

████████████████████████████

### E. Sanofi's Motion To Exclude Dr. Walton's Testimony Should Be Denied Because Dr. Walton's Opinion Regarding Canadian-Based Damages Will Assist The Jury.

Sanofi's argument that the Court should exclude Dr. Walton's testimony because his present-value Canadian damages calculation involves nothing more than "transcrib[ing] numbers into an excel spreadsheet" and no expertise is wrong. Dkt. # 276 at 24. Dr. Walton included this computation (in addition to damage computations in the United States, Europe and Japan) for the

benefit of the jury and the Court in the event that Sanofi is found to have breached the License Agreement and damages are at issue. Sanofi attacks Dr. Walton's present-value calculation but the jury should not be expected to run the calculation themselves. Numerous courts, including the Seventh Circuit and courts in this District, have held that Rule 702 does not require that expert testimony be based on more than simple arithmetic, and that is unreasonable to expect the jury to perform the same analysis. *See Wirtz v. Turner*, 330 F2d 11, 14 (7th Cir. 1964). *See also WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1031, 1040 (8th Cir. 2011) ("There is not, as WWFS suggests, an implicit requirements in Fed.R.Evid. 702 for the proffered expert to make **complicated** mathematical calculations.") (emphasis in original); *Smith v. Family Video Movie Club, Inc.*, No 11 C 1773, 2015 WL 1542663, at *5-6 (N.D. Ill. Mar. 31, 2015) ("The simplicity underlying his methodology ["basic mathematical computations"] does not, however, render his opinion unhelpful to the trier of fact."); *DL v. District of Columbia*, 109 F.Supp.3d 12, 33 (D.D.C. 2015) ("[W]hat is a simple mathematical computation to one person may be a mind-numbingly complicated to another."). Thus, the Court should reject Sanofi's argument and admit the testimony of Dr. Walton in its entirety.

## IV.    CONCLUSION

For all the foregoing reasons, Elorac respectfully requests that the Court enter an Order denying Sanofi's motion to exclude the testimony of Dr. Edward Fintan Walton in its entirety.

Dated: September 28, 2016              Respectfully submitted,

BARNES & THORNBURG LLP

*/s/ Carrie M. Raver*
Carrie M. Raver (ARDC # 6270475)
BARNES & THORNBURG LLP
110 E. Wayne Street, Suite 600
Fort Wayne, IN 46802
Telephone: (260) 425-4652
Facsimile: (260) 424-8316

E-mail:  carrie.raver@btlaw.com

William M. McErlean (ARDC # 3122871)
Lindsey D.G. Dates (ARDC # 6281254)
BARNES & THORNBURG LLP
One North Wacker Drive, Suite 4400
Chicago, IL 60606-2833
Telephone: (312) 357-1313
Facsimile: (312) 759-5646
E-mail:  wmcerlean@btlaw.com
E-mail:  ldates@btlaw.com

Attorneys for Plaintiff Elorac, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served this 28th day of September, 2016, by United States mail and electronically filing the same with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Christopher M. Strongosky
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY 10020
(christopher.strongosky@dlapiper.com)

Leeanne S. Mancari
DLA Piper LLP (US)
550 South Hope Street
Suite 2300
Los Angeles, CA 90071-2678
(leeanne.mancari@dlapiper.com)

Raj N. Shah
DLA Piper LLP (US)
203 N. LaSalle Street, Suite 1900
Chicago, IL 60601-1293
(raj.shah@dlapiper.com)

_/s/ Carrie M. Raver_
Carrie M. Raver, Esq.