## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **ELORAC, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 14 C 1859** |
| **v.** | ) | |
| | ) | |
| **SANOFI-AVENTIS CANADA, INC.,** | ) | **Judge Jorge L. Alonso** |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Elorac, Inc. ("Elorac") brings this bad-faith breach of contract action against defendant Sanofi-Aventis Canada, Inc. ("Sanofi"), alleging that Sanofi willfully breached a license agreement requiring it to make reasonable efforts to commercialize Elorac's Civamide cream pharmaceutical product, known as Zuacta, and pay Elorac royalties based on its sales. The case is before the Court on cross-motions for summary judgment and on Sanofi's motion to strike certain material in Elorac's response to its statement of facts under Local Rule 56.1. For the following reasons, the motions for summary judgment are granted in part and denied in part, and Sanofi's motion to strike is denied.

## I.      LOCAL RULE 56.1

Local Rule 56.1 requires a party opposing summary judgment to file "a concise response to the movant's statement [of material undisputed facts] that shall contain . . . a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon," LR 56.1(b)(3)(B), and "a statement . . . of any additional facts that require the denial of summary judgment." Sanofi moves to strike Elorac's Local

Rule 56.1 response, arguing that it does not comply with the rule because it is not concise, it is argumentative, and it smuggles in non-responsive facts, rather than include them in a separate statement of additional material facts.

Sanofi is correct in all three respects. The Court is entitled to require strict compliance with Local Rule 56.1, *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015), and Elorac's response is anything but "concise"; to the contrary, it is verbose, repetitive, and argumentative, and the Court was forced to disregard portions that were improper, extraneous, or misplaced. However, as Sanofi itself recognizes, this sort of motion to strike is disfavored because it "wastes time by requiring judges to engage in busywork and judicial editing without addressing the merits of a party's claim." *Paldo Sign & Display Co. v. Unified Mktg., LLC*, No. 13 C 1896, 2017 WL 951313, at *4 (N.D. Ill. Mar. 10, 2017) (internal quotation marks and alterations omitted). The Court bears in mind that the purpose of Local Rule 56.1 is "to isolate legitimately disputed facts and assist the court in its summary judgment determination." *Brown v. GES Exposition Servs., Inc.*, No. 03 C 3921, 2006 WL 861174, at *1 (N.D. Ill. Mar. 31, 2006). Despite its shortcomings, Elorac's response achieved this purpose. It assisted the Court in its summary judgment determination by making clear citations to specific documents to identify evidence that reveals whether there is a genuine factual dispute between the parties. Although Sanofi argues that Elorac's including non-responsive facts was unfair because Sanofi had no mechanism to reply, Sanofi did not identify, either in its motion to strike or its reply brief, any specific substantive prejudice it suffered, nor does the Court see any; the smuggled facts were often immaterial, and the Court simply ignored them. Sanofi's motion to strike is denied.

## II.    BACKGROUND

Elorac is a pharmaceutical company that develops pharmaceutical products for the treatment of skin diseases and conditions. Winston Laboratories, Inc. ("Winston"), is a related company that develops pharmaceutical products for the relief and management of pain, including pain due to osteoarthritis. Winston developed a proprietary compound known as Civamide, which it incorporated into a topical analgesic cream that it sought to market to patients suffering from osteoarthritis. Elorac is successor-in-interest to Winston's rights and interests in the Civamide cream product by virtue of an October 2012 transfer and assignment from Winston to Elorac.[1] (Def.'s Resp. to Pl.'s LR 56.1 Stmt. ¶ 8, ECF No. 410 (Sealed), ECF No. 417 (Redacted).)

On October 30, 2008, Winston and Sanofi entered into a license agreement ("the License Agreement"), in which Winston granted Sanofi an exclusive license to "make, have made, use and commercialize" its Civamide cream product ("the Product") in Canada. (Pl.'s Resp. to Def.'s LR 56.1 Stmt. ¶ 7, ECF No. 394 (Sealed), ECF No. 405 (Redacted); Oct. 30, 2008 License Agreement, § 2.1, Sealed App. Ex. 3, ECF No. 379 at 81, Redacted App. Ex. 3, ECF No. 387 at 81.) Sanofi agreed to "use Commercially Reasonable Efforts to Commercialize" the Product and to "sell and/or promote the Product in a manner consistent with sanofi-aventis' past marketing and sales practices or the customary practices within the industry." (License Agreement, §§ 6.1, 6.2.) The License Agreement defined the term "commercialize" to mean "to sell, offer for sale, import, export, transport, register, distribute, promote and market, together with other activities typically associated with maximizing the market penetration, profit margins and commercialization of a

---

[1] For simplicity, and given their identical postures throughout the events that form the background of this case, the Court will refer to both Winston and Elorac as "plaintiff."

pharmaceutical product." (License Agreement § 1.8.) The License Agreement defined "Commercially Reasonable Efforts" to mean

> efforts consistent with those generally utilized by companies of a similar size for their own internally developed pharmaceutical products of similar market potential, at a similar stage of their product life taking into account the existence of other competitive products in the marketplace or under development, the proprietary position of the product, the regulatory structure involved, the anticipated profitability of the product and other relevant factors. It is understood that such product potential may change from time to time based upon changing scientific, business and marketing and return on investment considerations.

(*Id.* § 1.9.) Under the License Agreement, Sanofi was required to pay Winston royalties of 12% of all "Net Sales of Product," as well as lump-sum milestone payments upon regulatory approval and upon reaching certain sales targets. (*Id.* §§ 7.2, 7.3, 7.6, 7.7.) The term, "Net Sales," refers to "the gross selling price of the Product in the Territory invoiced by sanofi-aventis, its Affiliates and its sublicensees to Third Parties," less certain deductions and offsets. (*Id.* § 1.36.) "Third Parties" are entities other than "(i) Licensor or any of its Affiliates and (ii) sanofi-aventis or any of its Affiliates." (*Id.* § 1.53.) "Affiliates" are entities that are, at some level, under common control. (*Id.* § 1.2.)

After entering into the License Agreement, the parties proceeded with efforts to secure regulatory approval to market the Product in Canada. Canada's health care regulatory agency, Health Canada, initially rejected Winston's application, advising in its October 15, 2009 Notice of Non-Compliance that the "pivotal trial was not designed to assess the efficacy and safety" of the Product for the proposed "indication" (*i.e.*, recognized use as a treatment for a particular disease or medical condition). (Pl.'s Resp. to Def.'s LR 56.1 Stmt. ¶¶ 23-24.) Winston resubmitted its application, and on July 15, 2010, Health Canada approved the Product for sale, but with a narrower indication than originally

sought. (*Id.* ¶¶ 23, 26-27.) The Product could be used not broadly for the relief of symptoms of osteoarthritis of the knee in adults, but only "in conjunction with oral COX-2 inhibitors or NSAIDs for the relief of severe pain in adult patients with osteoarthritis of the knee, not controlled with oral COX-2 inhibitors or NSAIDs alone, for a duration of no more than three months." (*Id.* ¶¶ 23, 27.)

In May 2010, as the process of obtaining regulatory approval was drawing to a close, Sanofi began to approach other pharmaceutical companies to determine whether they might be interested in taking over Sanofi's obligations under the License Agreement to distribute, market, promote, and sell the Product. (*Id.* ¶ 41.) On July 18, 2011, Sanofi signed what was captioned a "Distribution and Supply Agreement" (hereafter, the "Valeant Agreement") with Valeant International ("Valeant"), in which Valeant agreed to distribute, market, promote, and sell the Product in Canada. (*Id.* ¶ 45.) Valeant launched the Product in August 2011. (*Id.* ¶ 48.) Sanofi sold Valeant 35,695 units of the Product in 2011 (*id.* ¶ 52), 68,422 units in 2012 (*id.* ¶ 53), and 42,769 units in 2013 (*id.* ¶ 54). By mid-2013, demand for the Product was dropping so dramatically that Sanofi ceased submitting quarterly, rolling twelve-month forecasts to Elorac, as it was required to do under section 4.9 of the License Agreement, because it was no longer expecting to place any additional orders in the foreseeable future. (Def.'s Resp. to Pl.'s LR 56.1 Stmt. ¶¶ 29-30.) Plaintiff had contracted with DPT Laboratories, Ltd. ("DPT"), a drug manufacturer in Texas, to manufacture the Product, but in June 2013, with no further orders coming in, DPT provided Elorac with notice of cancellation of its manufacturing agreement. (*Id.* ¶¶ 13, 31.) According to Elorac's chief executive officer, Dr. Joel Bernstein, a DPT executive advised him in a telephone call that, with the collapse in sales volume, their manufacturing

arrangement had become uneconomical, and DPT would only be willing to manufacture the Product at such a low volume under a new contract, with higher prices and possibly a minimum annual purchase requirement.[2]  (*Id.* ¶¶ 32-33.)

In 2014 and 2015, Valeant did not place any orders for the Product.  (Pl.'s Resp. to Def.'s LR 56.1 Stmt. ¶ 55.)  Valeant's internal sales force had initially handled promotion of the Product, but in 2014, Valeant engaged an outside company, Vanguard Pharma Canada, to take over sales and promotional functions.  (*Id.* ¶ 56.)  Sales did not improve, and Elorac did not receive another order for the Product until October 1, 2015, almost a year and a half into the pendency of this case, when Sanofi sent an email to Dr. Bernstein to inquire about placing a new order.  (Def.'s Resp. to Pl.'s LR 56.1 Stmt. ¶ 34.)

In a letter dated October 8, 2015, Elorac responded to the October 1, 2015 email by informing Sanofi that Elorac was not in receipt of an up-to-date forecast, and Sanofi must submit a twelve-month forecast and correctly formatted purchase order, in compliance with the terms of the License Agreement, in order to place a proper order, to which Elorac would "respond appropriately."  (*Id.* ¶ 36.)  On January 13, 2016, Sanofi submitted a twelve-month forecast and a purchase order in the proper format, but Elorac rejected the order because it specified a delivery date in February, which gave Elorac less than the ninety days' notice that the License Agreement required.  (*Id.* ¶¶ 38-41.)  On January 15, 2016, Sanofi submitted a proper purchase order that complied with the all the terms of the License Agreement.  (*Id.* ¶ 42.)  In a January 19, 2016 letter, Elorac responded, "Elorac invokes

---

[2] Sanofi disputes this reason for DPT's termination of the contract as hearsay unsupported by any evidence other than Dr. Bernstein's declaration.  The Court includes it here only as background, not as a material fact.

Section 4.11 of the License Agreement in notifying you that we are unable to fill the order purportedly placed by your e-mail of January 15, 2016." (*Id.* ¶ 43.)

Section 4.11 of the License Agreement reads as follows:

**Failure to Supply --** Licensor shall immediately notify sanofi-aventis if Licensor is unable to fill any order placed by sanofi-aventis pursuant to Section 4.10. If Licensor is unable to cure such failure within ninety (90) days after such notice, Licensor shall permit the Second Source to manufacture the Product or to make arrangements directly with a third party manufacturer, at sanofi-aventis's cost and expense, until such time as Licensor's subcontractor is again able to fill orders placed.

After receiving Sanofi's October 1, 2015 email, Elorac had approached Sigma-Aldrich Fine Chemicals ("SAFC"), its supplier of Civamide, the Product's active ingredient, to solicit an estimate of what it would cost to purchase a small quantity of Civamide. (*Id.* ¶¶ 14, 47-48.) Based on its response, Elorac concluded that manufacturing the Product to sell to Sanofi in relatively small quantities was cost-prohibitive. (*Id.* ¶¶ 49-50.)

Under the License Agreement, Sanofi had the right to become a "Second Source" of the Product. Section 4.8 of the License Agreement permits Sanofi to manufacture the Product itself, rather than purchase it from plaintiff, with Sanofi's assistance:

**Second manufacturing source –** Sanofi-aventis, at its own cost and expense shall have the option to validate, qualify and obtain all approvals by any governing Authority for sanofi-aventis to act as a second source manufacturer (the "Second Source") of the Product. Should sanofi-aventis exercise its option to become such Second Source, it shall notify Licensor of same. Licensor shall provide assistance to sanofi-aventis to file the regulatory document required at such time by the governing Authority. As such, Licensor shall initiate within ninety (90) days of the Effective Date [of the License Agreement], a Know-How transfer . . . in favour of sanofi-aventis to become such Second Source to manufacture the Product in the Territory. Notwithstanding the foregoing, Licensor hereby recognizes and agrees that before sanofi-aventis' [*sic*] exercises its option to become the Second Source, the Parties shall negotiate, in good faith, the price of the active pharmaceutical ingredient.

Sanofi never exercised its right to become a "Second Source"; like Elorac, it judged that manufacturing the Product itself was not "economically reasonable." (*Id.* ¶ 51.)

On March 3, 2016, Sanofi informed Elorac by letter that, based on the series of events beginning October 1, 2015, and culminating in Elorac's rejection of the January 15, 2016 purchase order, Sanofi considered Elorac to be in breach the License Agreement. (*Id.* ¶ 52.) In the correspondence that followed, Elorac provided Sanofi with draft consent agreements that would allow Sanofi to contract directly with SAFC and DPT to manufacture the Product, but Sanofi did not attempt to execute the agreements or take any other steps toward manufacturing the Product itself. (*Id.* ¶ 55.) On August 26, 2016, Sanofi sent Elorac a "Notice of Termination" letter in which it terminated the License Agreement, both for cause under section 14.3 and, in the alternative, unilaterally with one hundred eighty days' prior written notice, per section 14.2. (*Id.* ¶ 58.)

Elorac's Second Amended Complaint contains two counts, both for bad-faith breach of contract. In Count I, Elorac claims that Sanofi breached the License Agreement, intentionally, willfully, or in bad faith, by miscalculating royalties based on the transfer price paid to Sanofi by Valeant, instead of paying royalties based on the net sales Valeant made to its customers. (2d. Am. Compl. ¶¶ 141-51, ECF No. 222 (Sealed), ECF No. 223 (Redacted).) In Count II, Elorac claims that Sanofi breached the License Agreement, intentionally, willfully, and in bad faith, by failing to use commercially reasonable efforts to commercialize the Product, costing plaintiff millions of dollars in lost profits. (*Id.* ¶¶ 152-65.) Sanofi has filed a counterclaim, seeking a declaratory judgment that (1) by rejecting the January 15, 2016 purchase order and taking the position that it need not supply Sanofi with the Product, Elorac has repudiated and/or materially breached the License

Agreement; and (2) Sanofi lawfully terminated the License Agreement by sending Elorac its August 26, 2016 "Notice of Termination" letter. (Countercl. for Declaratory J. ¶¶ 45-59, ECF No. 230 (Sealed), ECF No. 231 (Redacted).) Sanofi seeks summary judgment against Elorac on both counts of the complaint and on its declaratory counterclaim. Elorac opposes Sanofi's motion and cross-moves for summary judgment on the counterclaim.

## III.  LEGAL STANDARDS

To prevail on a summary judgment motion, "the movant [must] show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the court must view all evidence and draw all inferences in favor of the non-moving party. *See Wesbrook v. Ulrich*, 840 F.3d 388, 391 (7th Cir. 2016); *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014). At this stage, the court may not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Talanda v. KFC Nat'l Mgmt. Co.*, 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting *Anderson*, 477 U.S. at 248); *see also Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013).

The parties agree that, pursuant to section 15.1 of the License Agreement, New York law governs this dispute. To recover for breach of contract under New York law, a party must prove (1) the existence of a valid contract; (2) that the party performed its obligations; (3) breach of contract by the opposing party; and (4) damages caused by the

breach. *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52-53 (2d Cir. 2011). "Under New York law, unambiguous contracts are interpreted as a matter of law." *82-11 Queens Blvd. Realty, Corp. v. Sunoco, Inc. (R & M)*, 951 F. Supp. 2d 376, 381 (E.D.N.Y. 2013) (citing cases).

## IV. COUNT I—MISCALCULATED ROYALTIES

In support of its motion for summary judgment on Count I, Sanofi argues that it correctly calculated the royalties it paid Elorac and that Count I is based on a mistaken interpretation of Sanofi's agreement with Valeant. The License Agreement required Sanofi to pay royalties of 12% of "Net Sales," which are defined as "the gross selling price of the Product in the Territory invoiced by sanofi-aventis, its Affiliates and its *sublicensees* to Third Parties" (emphasis added). Elorac contends that Valeant is a "sublicensee," engaged by Sanofi to take over its marketing, promotion, and commercialization obligations under the License Agreement. Because Valeant is a sublicensee, according to Elorac, the License Agreement required Sanofi to calculate royalties based on the dollar amount of Valeant's sales to its customers.

Sanofi argues that Valeant was not a sublicensee but a distributor, which made it, in terms of the License Agreement, a "Third Party." As such, according to Sanofi, the proper measure of royalties was 12% of the dollar amount of Sanofi's sales to Valeant, not of Valeant's sales to its own customers. In support of its interpretation, Sanofi points to section 2.1 of the License Agreement, in which the parties agreed, "sanofi-aventis may exercise its rights and obligations under this Agreement through its Affiliates, *distributors* and sub-distributors . . . . Such exercise shall not constitute a sublicense" (emphasis added). Thus, Sanofi argues, the License Agreement specifically contemplates that Sanofi might enter into a distribution agreement such as the one it signed with Valeant.

Elorac responds that this argument represents no more than a "fiction" (Pl.'s Mem. in Opp'n to Sanofi's Mot. for Summ. J. at 23, ECF No. 393 (Sealed), ECF No. 404 (Redacted)) that Sanofi devised so that it could dump its obligations under the License Agreement on Valeant without having to seek approval from its parent company. (*See* Pl.'s Resp. to Def.'s LR 56.1 Stmt., ¶ 45 at 41 (quoting Sanofi 30(b)(6) representative explaining, "from an internal Sanofi approval perspective, [it was] much faster to get a distribution agreement approved rather than go through an [authorization of financial investment] . . . similar to the one that we did for a license agreement with Winston. We would have needed to do that if we would go through a sublicense agreement.").) A review of Sanofi's agreement with Valeant, Elorac argues, reveals the "fiction" because it appears that "Sanofi delegated to Valeant many rights and obligations that have nothing to do with distribution *per se*." (Pl.'s Mem. in Opp'n at 24.).

Based on the plain language of the contracts, and viewing the relevant contract terms of each contract in light of the contract as a whole, the Court agrees with Elorac that Valeant is a "sublicensee," as that term is used in the License Agreement. True, the License Agreement explicitly contemplates that Sanofi might enter into agreements with distributors, and the Valeant Agreement appears on its face to be a distribution agreement—but a close examination shows the agreement is similar in numerous essential aspects to the License Agreement. It has the same basic purpose—to commercialize the Product by way of making "Commercially Reasonable Efforts to market, promote, distribute and sell" the Product—and conveys similar rights toward that end. (Pl.'s App. to LR 56.1 Resp. Ex. 1.RR, Valeant Agreement § 5.1, ECF No. 401-8 (Sealed) at 200) The License Agreement conveys "the exclusive license . . . to . . . Commercialize the . . .

Product," where "Commercialize" is defined as "to sell, offer for sale, . . . distribute, promote and market, together with other activities typically associated with maximizing the market penetration, profit margins and commercialization of a pharmaceutical product." (License Agreement, §§ 1.8, 2.1.) Similarly, in the Valeant Agreement, Sanofi not only gave Valeant "full responsibility for all aspects of the distribution, marketing and sale of the Product," it also gave Valeant the "exclusive right and absolute discretion to (i) set prices . . . and (iv) establish the strategy for the commercialization of the Product in the Territory." (Pl.'s Resp. to Def.'s LR 56.1 Stmt. ¶ 51 at 51 (quoting Valeant Agreement § 5.2).)

Sanofi argues that it did not convey to Valeant any of the rights it licensed from plaintiff because a paragraph in the Valeant Agreement reads as follows:

> **No License** – Except as provided herein, this Agreement in no way confers on the Receiving Party any right or license of any kind regarding any Confidential Information of a Disclosing Party and *no right or license under any patent, patent application, copyright or trade mark[3] is granted, or to be construed as being granted, to the Receiving Party.*

(Valeant Agreement § 10.4. (emphasis added).)

Sanofi misinterprets the Valeant Agreement. The "No License" paragraph Sanofi quotes appears in Article 10, "Confidentiality," and based on its context, it appears to refer to licenses "regarding any Confidential Information," which is a defined term referring to information concerning such matters as business operations, methods, internal data, and

---

[3] Sanofi admits that there is an exception for trademark rights, which the Agreement does confer on Valeant, but Sanofi contends that it only licensed its own trademark rights to Valeant, not plaintiff's. Sanofi granted Valeant an "exclusive, royalty-free license to use the Trademarks," which are defined as those trademarks or related intellectual property "used by sanofi-aventis to identify or promote the Product." (Valeant Agreement §§ 1.63, 11.1.) It is far from clear that this refers only to Sanofi's trademarks, rather than trademarks owned by plaintiff that Sanofi has itself licensed from plaintiff, but ultimately the trademark language is beside the point because it is clear from other language that the Valeant Agreement is a license agreement.

processes, not necessarily directly related to the Product. (Valeant Agreement § 1.13.) It does not follow that the Valeant Agreement conveys no license of any kind. For example, in addition to the right to commercialize described above, Article 11, "Intellectual Property," specifically "grants to Distributor a non-exclusive, royalty-free license in [the] Intellectual Property [relating to the Product] (other than the Trademarks, for which a license has been granted pursuant to Section 11.1 herein)" so that Valeant may perform its commercialization obligations, including "marketing, promotion, distribution, [and] sale."

Although Sanofi did not convey to Valeant the right to make or manufacture the Product, so its license is broader than the license it gave to Valeant, Sanofi conveyed important rights related to commercializing the Product that went to the core of the License Agreement. Sanofi elevates form over substance by insisting that its agreement with Valeant is a distribution agreement, but its agreement with plaintiff is a license agreement. Plaintiff licensed rights in the Product to Sanofi so that it could commercialize the Product in Canada, and Sanofi transferred many of those rights, and accompanying duties, to Valeant. Because Sanofi signed a license agreement with plaintiff, and contracted away the core of the cluster of rights it had obtained, Valeant is properly a "sublicensee" of the Product.

## V.    COUNT II—FAILURE TO COMMERCIALIZE

Sanofi argues that it is entitled to summary judgment on Elorac's Count II claim for breach of contract for failure to commercialize the Product because Elorac cannot prove any actual damages.

### A.  Whether The Limitation of Liability Clause Bars Elorac's Damages

According to Sanofi, the only damages Elorac has sought to prove on Count II are lost profits, but the License Agreement specifically bars the parties from recovering damages for "loss of profits":

> IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR LOSS OF PROFITS, SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF ANY BREACH OF THIS AGREEMENT.

(License Agreement § 13.4 (emphasis in original).) Sanofi argues that this limitation of liability provision should be enforced strictly, according to its plain terms, to bar Elorac from recovering anything but nominal damages in this case. Elorac responds that (1) the term "loss of profits" in the limitation of liability provision does not apply to the damages Elorac is seeking, and (2) even if it does, the limitation of liability provision is unenforceable under New York law because Sanofi's breach of contract was the result of bad-faith misconduct in reckless disregard of plaintiff's rights.

### 1. *Whether Elorac's Damages Are For "Loss of Profits" Within The Meaning Of Limitation Of Liability Clause*

Elorac argues that, even if its damages are properly characterized as lost profits[4] under New York law, lost profits may be either (a) general or direct damages, or (b) consequential or special damages. According to Elorac, the limitation of liability provision

---

[4] Elorac characterizes its damages on Count II not as lost profits but as lost revenue, in the form of royalties and milestone payments that it would have received but for Sanofi's alleged breach. (*See* Pl.'s Mem. in Opp'n at 7-12 (citing, *inter alia*, *Honeywell Int'l, Inc. v. Northshore Power Sys., LLC*, 936 N.Y.S.2d 59 (Sup. Ct. 2011).) Sanofi replies that any distinction between "lost profits" and "lost revenue" from royalties and related payments is illusory; profits are simply revenue less costs, and if royalties and milestone payments are revenue without costs (because they are generated merely by a licensee's use of a licensor's product, without any fresh investment of resources by the licensor), then they are identical to profits. The cases Elorac cites in support of its position on this point are not persuasive, and the Court tends to agree with Sanofi, but ultimately it makes no difference. As the Court will explain below, based on its interpretation of the License Agreement's limitation of liability provision, the present motion turns not on whether Elorac's lost royalties should be characterized as profit, but rather on whether they are general damages or consequential damages.

14

should be interpreted to bar only special or consequential lost profit damages, which means Elorac can still seek lost profits as general damages. The Court will first consider whether the damages Elorac is seeking are properly characterized as general or consequential damages, and then it will address the meaning of the limitation of liability provision.

> *a. General Versus Consequential Damages*

The New York Court of Appeals has explained the distinction between general and consequential lost profit damages as follows:

> General damages are the natural and probable consequence of the breach of a contract. They include money that the breaching party agreed to pay under the contract. By contrast, consequential, or special, damages do not directly flow from the breach. . . . Lost profits may be either general or consequential damages, depending on whether the non-breaching party bargained for such profits and they are the direct and immediate fruits of the contract. Otherwise, where the damages reflect a loss of profits on collateral business arrangements, they are [consequential damages].

*Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 11 N.E.3d 676, 680 (N.Y. 2014) (internal citations and quotation marks omitted). Consequential damages typically arise when:

> the ability of the non-breaching party to operate his business, and thereby generate profits on collateral transactions, is contingent on the performance of the primary contract. When the breaching party does not perform, the non-breaching party's business is in some way hindered, and the profits from potential collateral exchanges are "lost." Every lawyer will recall from his or her first-year contracts class the paradigmatic example of *Hadley v. Baxendale*, where Baxendale's failure to deliver a crank shaft on time caused Hadley to lose profits from the operation of his mill. 9 Ex. 341, 156 Eng. Rep. 145 (1854).

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007).

In *Biotronik*, a breach of contract case brought by a distributor against a medical device manufacturer, the New York Court of Appeals explained that the distributor's lost profits were general damages, not consequential damages, in part because the amount the

distributor was required to pay the manufacturer was calculated as a percentage of the distributor's net sales under the contract:

> The contract clearly contemplated that plaintiff would resell defendant's stents. That was the very essence of the contract. Any lost profits resulting from a breach would be the natural and probable consequence of that breach. Although the lost profits sought by plaintiff are not specifically identified in the agreement, it cannot be said that defendant did not agree to pay them under the contract, as these profits flow directly from the pricing formula. The purpose of the agreement was to resell. . . . The fact is that both defendant and plaintiff depended on the product's resale for their respective payments.

11 N.E.3d at 682 (internal citations and quotation marks omitted) (citing *Tractebel*, 487 F.3d at 108; *Am. List Corp. v. U.S. News & World Report, Inc.*, 549 N.E.2d 1161, 1164 (N.Y. 1989)). The court rejected the argument that the lost profits were not a natural and probable cause of the breach merely because they did not represent a sum that the contract specifically required the defendant to pay, explaining that this argument "place[d] form over substance." 11 N.E.3d at 682. Because the "agreement reflect[ed] defendant's anticipation and dependence on the resale," the damages in the form of the lost resale profits were a natural and probable consequence of the breach. *Id.* at 683.

The *Biotronik* court relied in part on *Orester v. Dayton Rubber Manufacturing Co.*, 126 N.E. 510, 512 (N.Y. 1920), which held that, where a manufacturer breached a contract by failing to supply its distributor, lost profits were general damages if the contract contemplated that the distributor would "build[] up a business for the sale of the [product] and creat[e] a demand for that particular" product; under such circumstances, the distributor's anticipated resale profits are not the result of "collateral engagements or consequential damages."

These cases are similar to this case, and they demonstrate that plaintiff's damages are general, not consequential. Plaintiff is not seeking "speculative profits on collateral transactions"; it is seeking the "benefit of the bargain" it made when it executed the License Agreement, *Tractebel*, 487 F.3d at 110, namely, the royalties it claims it would have earned if Sanofi had made reasonable efforts to commercialize the Product by making the same level of promotional effort and investment it made in its own products. These royalties, calculated as a percentage of net sales to be generated by Sanofi's commercialization efforts, are similar to the lost resale profits in *Biotronik* and *Orester*. The commercialization of the Product was the essential purpose of the License Agreement, and damages caused by Sanofi's failure to perform its obligations toward that end are natural and probable consequences flowing directly from the breach. *See Am. Bd. of Cardiovascular Med., Inc. v. John Wiley & Sons, Inc.*, No. 16CV00469, 2016 WL 9383326, at *2-3 (M.D. Fla. June 15, 2016) (citing *Tractebel*, 487 F.3d at 109-10.) Elorac's lost profits are general damages.

### b. *Whether "Loss of Profits" Refers to General Damages*

Sanofi argues that the distinction between general damages and consequential damages is of no significance here because, unlike in *Biotronik*, the License Agreement's limitation of liability provision specifically bars recovery of damages for "loss of profits." As Sanofi explains, New York law recognizes limitation of liability clauses as commonplace, valid, and strictly enforceable, and therefore, Sanofi argues, this Court should not hesitate to enforce the limitation of liability clause strictly, according to its plain terms. (*See* Def.'s Mem. in Supp. of Summ. J. at 12, ECF No. 377 (Sealed), ECF No. 385 (Redacted) (citing *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504, 507

(N.Y. 1994) ("'[T]he courts see no harm in express agreements limiting the damages to be recovered for breach of contract. . . . Parties sometimes make agreements and expressly provide that they shall not be enforceable at all, by any remedy legal or equitable. They may later regret their assumption of the risks of non-performance in this manner; but the courts let them lie on the bed they made.'") (quoting 11 *Corbin on Contracts* § 58.16); *World-Link, Inc. v. Citizens Telecom. Co.*, No. 99CIV3054 GEL, 2000 WL 1877065, at *5 (S.D.N.Y. Dec. 26, 2000) ("It may have been unwise, given the nature of its business, for World-Link to enter an Agreement containing [a provision barring recovery of consequential damages]. But it did, and it cannot be said that the exclusion of consequential damages is so odd, or so inconsistent with the obligations undertaken by CTC, that it simply can't mean what it says."))). According to Sanofi, the limitation of liability provision uses the plain term "loss of profits," without distinguishing between general and consequential damages, and therefore the provision bars recovery of any lost profit damages at all, under any theory, whether general or consequential. *See Imaging Sys. Int'l, Inc. v. Magnetic Resonance Plus, Inc.*, 490 S.E.2d 124, 127 (Ga. Ct. App. 1997) ("The contract at issue did not distinguish between the two types; it forbade the recovery of "ANY LOST PROFITS." No exceptions were provided for. . . . Both consequential damages *and* direct damages (to the extent direct damages concern lost profits) are not recoverable under the contract.").

Elorac argues that "loss of profits" refers only to lost profits as consequential damages, reasoning that the term appears in a series of terms describing types of damages that do not flow directly from the breach of contract—like consequential damages, but unlike general damages. Elorac relies heavily on *Nielsen Co. (U.S.), LLC v. Success Sys., Inc.*, 112 F. Supp. 3d 83, 102-03 (S.D.N.Y. 2015) and *In re Indesco Int'l, Inc.*, 451 B.R.

274, 315-16 (Bankr. S.D.N.Y. 2011). In both cases, as in this case, the bar on recovery of lost profits found in the limitation of liability clauses appeared in the midst of language barring consequential damages, punitive damages, and the like. Both cases cited the maxim *noscitur a sociis* ("a word is known by the company it keeps") and reasoned that the term "lost profits," given its proximity to terms like "consequential damages," must mean something similar to "consequential damages." But both cases are distinguishable from this case in an important respect: the limitation of liability clauses provided that "neither party shall be liable" for consequential damages, etc., "***including*** . . . lost profits." *See Nielsen*, 112 F. Supp. 3d at  102 ("neither party shall be liable to the other party for special, incidental, consequential, indirect, punitive or exemplary damages ***including*** but not limited to . . . lost profits") (emphasis added); *Indesco*, 451 B.R. at 315 ("NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY PUNITIVE, CONSEQUENTIAL, LIQUIDATED, INCIDENTAL OR INDIRECT DAMAGES, ***INCLUDING*** DAMAGES FOR LOST PROFITS") (emphasis added). The plain language of the contracts, both of which excluded consequential damages "including" lost profits, showed that the type of "lost profits" that the contracts barred were those that fell within the category of consequential damages. These cases provide little support for Elorac's position because the License Agreement's limitation of liability language is different.

For its part, Sanofi relies on *Bardy v. Cardiac Science Corp.*, No. C13-778, 2014 WL 294526, at *5 (W.D. Wash. Jan. 27, 2014), in which the court ruled that a physician's claim for lost royalties against a medical device developer for failing to commercialize the physician's invention was barred by a limitation of liability clause, which provided, "Neither party will be liable to the other with respect to the subject matter of this agreement

for any incidental, indirect, consequential, special, or punitive damages, or lost profits."
According to the court, the limitation of liability clause barred recovery of the lost royalties
the physician sought because they were a "paradigmatic example of lost profits." *Id.* But
*Bardy*'s meager analysis limits its persuasive value. Additionally, the contract language
was slightly different. The term "lost profits" was separated from the enumerated
categories of damages by a comma and the conjunction "or," which the court may have
understood to signal a transition or a shift in meaning. In this case, by contrast, the term
"LOSS OF PROFITS" and the enumerated categories of damages appear to be part of a
single list of items.

In *Callisto Corp. v. Inter-State Studio & Publishing Co.*, No. CIV.A.05-11953,
2006 WL 1240711, at *1 (D. Mass. May 4, 2006), the limitation of liability language was
similar to the language in *Bardy*, but the court reached a different result. The license and
distribution agreement provided as follows: "NEITHER PARTY SHALL BE LIABLE TO
THE OTHER PARTY FOR ANY LOSS OF REVENUE OR PROFITS OR FOR
INDIRECT, INCIDENTAL, SPECIAL CONSEQUENTIAL OR OTHER SIMILAR
DAMAGES." The court concluded that the "loss of revenue or profits" term did not bar
recovery of lost royalties that were general damages. If the agreement barred recovery of
lost royalties generally, the court reasoned, that would "prevent [the plaintiff] from
recovering *any* unpaid royalties, including those which might already have accrued under
the contract." *Id.* But that could not have been the parties' intent, given that other
provisions of the agreement, including a provision requiring defendant to immediately
remedy any deficiency in royalties by remitting payments due and a provision requiring
the parties to give one hundred eighty days' notice to terminate the agreement, served to

protect the licensor's right to benefit from its bargain by receiving royalties for the distribution of its product. If plaintiff could not recover lost royalties in an action for breach contract, then the defendant could "refuse to perform with impunity," and these provisions would be meaningless.[5] *Id.* at *1 n.3. Under a common-sense reading of the license and distribution agreement, the court concluded, "the phrase 'loss of revenue or profit' as used in the limitation of liability clause refers to revenues and losses in a consequential sense and does not encompass the royalty payments which are the fruit of the Agreement." *Id.* at *2.

This case is similar to *Callisto*, and the Court agrees with Elorac that *Callisto*'s reasoning is persuasive. As in *Callisto*, the License Agreement protects against unpaid royalties (Section 7.10 spells out a detailed procedure for auditing royalty payments and remedying any overpayments or underpayments the audit might reveal), and the License Agreement requires one hundred eighty days' notice before a party may unilaterally terminate it. These protective features are essentially meaningless if a party breaching them is not liable for lost profits (or in plaintiff's case, lost royalties) as general damages in a breach of contract action. There would have been no point entering into such a detailed agreement if "non-performance could carry no possibility of sanction." *Id.* at *1 n.3.

Of course Sanofi is correct that clear contract terms must be enforced as written, regardless of how strange the bargain might seem, but contract terms must be interpreted not in isolation, but in their full context, viewing the contract as a whole. *See RCJV*

---

[5] Additionally, the court rejected the argument that the lost royalties the plaintiff sought under the license and distribution agreement were consequential damages, reasoning that the royalty payments were the defendant's "primary consideration for the license it obtained," and lost royalties would be the "natural and probable consequence of a failure to perform" by defendant. *Id.* at *2.

*Holdings, Inc. v. Collado Ryerson, S.A. de C.V.*, 18 F. Supp. 3d 534, 545 (S.D.N.Y. 2014)

("Because contract interpretation is an exercise in 'common sense' rather than 'formalistic

literalism,' 'words should be considered, not as if isolated from the context, but in the light

of the obligation as a whole and the intention of the parties as manifested thereby.'")

(quoting *Duane Reade, Inc. v. Cardtronics, LP*, 863 N.Y.S.2d 14, 19 (App. Div. 2008));

*Callisto*, 2006 WL 1240711, at *2. The term "loss of profits" is joined with a comma—

but no conjunction—to a series of adjectives modifying the noun "damages." Given this

(perhaps inartful) phrasing, the principle of *noscitur a sociis* is even more useful than in

*Indesco* and *Nielsen*. The Supreme Court recently explained the principle as follows:

> As explained in *Gustafson v. Alloyd Co.,* 513 U.S. 561, 575 (1995), we rely
> on the principle of *noscitur a sociis*—a word is known by the company it
> keeps—to "**avoid ascribing to one word a meaning so broad that it is
> inconsistent with its accompanying words, thus giving unintended
> breadth to the Acts of Congress**." (internal quotation marks omitted). *See
> also United States v. Williams,* 553 U.S. 285, 294 (2008) ("a word is given
> more precise content by the neighboring words with which it is associated").
> In *Gustafson,* we interpreted the word "communication" in § 2(10) of the
> Securities Act of 1933 to refer to a public communication, rather than any
> communication, because the word appeared in a list with other words,
> notably "notice, circular, [and] advertisement," making it "apparent that the
> list refer[red] to documents of wide dissemination." 513 U.S. at 575-76.
> And we did so even though the list began with the word "any."

*Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) (internal citations altered) (emphasis

added); *see also Dole v. United Steelworkers of Am.,* 494 U.S. 26, 36 (1990) ("The

traditional canon of construction, *noscitur a sociis*, dictates that words grouped in a list

should be given related meaning.") (internal quotation marks omitted).[6] The phrase

---

[6] Although these cases interpreted statutes, not contracts, *noscitur a sociis* is a "traditional canon
of both statutory and contract construction." *Bobrow Palumbo Sales, Inc. v. Broan-Nutone, LLC*,
549 F. Supp. 2d 249, 273 (E.D.N.Y. 2008); *see also Rockland Exposition, Inc. v. Great Am. Assur.
Co.*, 746 F. Supp. 2d 528, 538 n.8 (S.D.N.Y. 2010) ("It is not uncommon for courts

"LOSS OF PROFITS, SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES," composed as it apparently is of a single series of items, with nothing separating "loss of profits" from the enumerated types of damages, suggests that all the items in the series are alike in some way. Indeed, at least three of the terms—special damages, indirect damages, and consequential damages—are synonyms under New York law:

> "Consequential," "special" and "indirect" damages are synonymous terms, *see Black's* [*Law Dictionary*] at 445-46 ("[C]onsequential damages . . . [are a]lso termed indirect damages."); 3 [Dan B.] Dobbs [Law of Remedies] § 12.2(3), at 38 ("[S]pecial damages is [*sic*] also referred to as consequential damages. . . ."), that "seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach." *Schonfeld* [*v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000)].

*In re CCT Commc'ns, Inc.*, 464 B.R. 97, 117 (Bankr. S.D.N.Y. 2011). The enumerated damages are all alike in that they serve some purpose other than compensating plaintiff for the "value of the promised performance."

In this context, the term "loss of profits" surely also refers to damages other than those for the value of the promised performance. To interpret the term "loss of profits" to include general lost profit damages, as Sanofi urges, would be to "ascrib[e] to [the term "loss of profits"] a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth" to the limitation of liability provision. *Yates*, 135 S.Ct. at 1085 (citing *Gustafson*, 513 U.S. at 575); *see Dole,* 494 U.S. at 36.

Under New York law, a contract must be read as a whole, with effect and meaning given to every term and a reasonable effort made to harmonize the terms, so as to give

---

interpreting contracts to rely on the same principles that guide statutory construction.") (citing cases).

effect to—not nullify—its general or primary purpose. *In re El-Roh Realty Corp.*, 902 N.Y.S.2d 727, 729 (App. Div. 2010). "'The presumption in commercial contracts is that the parties were trying to accomplish something rational. . . . Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons.'" *Koninklijke Philips Elecs. N.V. v. Cinram Int'l Inc.*, 603 F. Supp. 2d 735, 739 (S.D.N.Y. 2009) (quoting *Fishman v. LaSalle Nat'l Bank,* 247 F.3d 300, 302 (1st Cir. 2001)); *see Callisto*, 2006 WL 1240711, at *2 (quoting the same language in *Fishman*). Viewing the term, "loss of profits," in the context of the surrounding words and the contract as a whole, it is not reasonable to interpret the term to refer to general lost profit damages, as Sanofi urges. Elorac's damages are outside the scope of the License Agreement's limitation of liability clause, and Sanofi's motion for summary judgment is denied as to this basis.

## 2. *Whether The Limitation Of Liability Clause Is Unenforceable Because Sanofi Breached The License Agreement In Bad Faith*

Elorac argues in the alternative that, even if it seeks damages that fall within the scope of the limitation of liability clause, the clause is not enforceable because Sanofi breached the License Agreement willfully and in bad faith.

Under New York law, for public policy reasons, a limitation of liability clause is unenforceable by a party who has breached the contract by committing, "in contravention of acceptable notions of morality, . . . misconduct [that] smacks of intentional wrongdoing." *Kalisch-Jarcho, Inc. v. City of N.Y.*, 448 N.E.2d 413, 416 (N.Y. 1983). Misconduct triggers this rule if it is "fraudulent, malicious, or prompted by the sinister intention of one acting in bad faith," or "when, as in gross negligence, it betokens a reckless indifference to the rights of others." *Id.* at 416-17. The limitation of liability clause remains enforceable if the alleged misconduct is no more than "intentional nonperformance

. . . motivated by financial self-interest."  *Noble Lowndes*, 643 N.E.2d at 508; *see*

*Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 450-55

(S.D.N.Y. 2003) (surveying cases and concluding that they require "a compelling

demonstration of egregious intentional misbehavior evincing extreme culpability" to avoid

a limitation of liability clause).

At most, viewing the evidence in the light most favorable to Elorac, Sanofi may be

guilty of delegating its commercialization duties to Valeant in a cynical attempt to recoup

its milestone payment quickly and cheaply, rather than as part of a serious effort to

maximize the Product's sales.  For example, Elorac cites statements in Sanofi emails in

which Sanofi personnel state or suggest that (1) there were misgivings about the Product

among some of Sanofi's marketing people, but Sanofi was unwilling to walk away from

the Licensing Agreement without recouping some of the two million dollars it spent on the

regulatory approval milestone payment; (2) even after the Product obtained regulatory

approval with a limited indication, the Product's outlook remained relatively positive; and

(3) the most profitable long-term scenario was for Sanofi to launch and market the Product

itself, rather than make a deal with Valeant to obtain early return on investment, but in that

scenario the Product would not become profitable for four or five years, after a sustained

campaign.  (Pl.'s Resp. to Def.'s LR 56.1 Stmt. ¶ 75 at 68, 70, 73 (citing May 6, 2010 email

of Manon Decelles, Pl.'s App. Ex. 1.M, ECF No. 397-3 at 112; July 7, 2010 email of

Manon Decelles, Pl.'s App. Ex. 1.J, ECF No. 397-3 at 104-05; May 5, 2011 email of Eric

Vincent, Pl.'s App. Ex. 1.Y, ECF No. 398-8 at 71 (translated from French and interpreted

in text of Rule 30(b)(6) Dep. Tr. at 254:6-260:23, ECF No. 398-1 at 69)).)  In the light most

favorable to plaintiff, this evidence may show that Sanofi failed to "maximize[e] the market

penetration, profit margins and commercialization" of the Product" (License Agreement §
1.8), which may have been commercially unreasonable conduct, but Sanofi's actions do
not rise to the level of "extreme" or "egregious" misconduct, *Net2Globe*, 273 F. Supp. 2d
at 454, committed with "tortious intent"," *In re CCT Commc'ns*, 464 B.R. at 106. *See*
*Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532, 545
(S.D.N.Y. 2013) ("This conduct could be deemed commercially unreasonable, but
commercial reasonableness requires significantly less culpability than 'a compelling
demonstration of egregious intentional misbehavior.'") (quoting *Net2Globe*, 273 F. Supp.
2d at 454); *see also In re Lyondell Chem. Co.*, 585 B.R. 41, 57 (S.D.N.Y. 2018) (under
*Noble Lowndes*, 643 N.E.2d at 507, having "ulterior motives" or "tak[ing] economic
advantage of a contractual counterparty" is not enough to avoid a limitation of liability
clause). The License Agreement's limitation of liability clause is enforceable, although,
as the Court explained in the previous section of this Opinion, Elorac's general lost profit
damages do not fall within its scope.

### B. Whether Elorac's Lost Profit Damages Are Too Speculative

Sanofi argues that Elorac cannot prove its lost profits damages with the certainty
required under New York law. (*See* Def.'s Mem. in Supp. of Summ. J. at 21-22, ECF No.
377 (Sealed), ECF No. 385 (Redacted) (citing *Kenford Co., Inc. v. Cty. of Erie*, 493 N.E.2d
234, 235 (N.Y. 1986)).) In response, Elorac argues that Sanofi wrongly applies the higher
standard of proof applicable to consequential damages; Elorac's lost profits damages are
general damages, which need only meet a lower burden of proof. *Tractebel*, 487 F.3d at
111 ("The law of New York is clear that . . . the non-breaching party need only provide a
stable foundation for a reasonable estimate of damages before an award of general damages

can be made.") (internal quotation marks and alterations omitted); *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977); *Indesco*, 451 B.R. at 316.

Sanofi replies by insisting that Elorac's lost profits damages are consequential, but the Court has already explained that, under *Biotronik*, 11 N.E.3d at 682, Elorac's lost profits damages are properly characterized as general damages. Under that standard, Elorac must prove with reasonable certainty that its damages flow from Sanofi's breach, but the law tolerates some degree of uncertainty as to the amount of general damages:

> "Certainty," as it pertains to general damages, refers to the *fact* of damage, not the amount. For "when it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach. A person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he has caused is uncertain."

*Tractebel*, 487 F.3d at 110 (quoting *Wakeman v. Wheeler & Wilson Mfg. Co.*, 4 N.E. 264, 266 (N.Y. 1886)).

To prove its lost profits, Elorac proffers the testimony of its expert, Dr. Richard Manning. This Court has already has already ruled in an earlier opinion that Dr. Manning's testimony is admissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (*See* July 27, 2017 Sealed Mem. Op. & Order, ECF No. 370; Aug. 21, 2017 Redacted Mem. Op. & Order, ECF No. 372.) Dr. Manning's testimony, combined with the copious fact evidence in the record, is more than sufficient to prove Elorac's general lost profit damages. Sanofi's motion is denied as to this basis.

## VI. SANOFI'S COUNTERCLAIM—BREACH AND TERMINATION OF CONTRACT BASED ON FAILURE TO SUPPLY

Both parties move for summary judgment on Sanofi's counterclaim, in which Sanofi alleges that Elorac breached the License Agreement when it failed to fill the order

Sanofi placed on January 15, 2016. Elorac argues that this was not a breach because the License Agreement explicitly gave Elorac the right to notify Sanofi that it was unable to fill an order, in which case Sanofi could manufacture the Product itself or make arrangements directly with a third-party manufacturer. Further, Elorac argues that, at the time it placed the January 15, 2016 order, Sanofi was in breach of the contract, so it could not properly exercise its right to terminate the contract based on Elorac's alleged breach. Therefore, according to Elorac, the contract is still in force.

### A. Whether Sanofi Breached By Failing To Submit Forecasts

Elorac argues that Sanofi was in breach of the contract at the time it submitted the January 15, 2016 order because it had not submitted the quarterly twelve-month rolling forecasts that the License Agreement required for more than two years. In support of its position, Elorac block-quotes the following passage, which in turn quotes from a leading treatise:

> It is black-letter law that "[a] party to a contract who is already personally in default cannot, as a general principle . . . maintain a suit for its breach, even if the other party subsequently breaches the contract as well [since] a contracting party cannot benefit from its own breach."

*Guardian Music Corp. v. James W. Guercio Enters., Inc.*, 459 F. Supp. 2d 216, 223 (S.D.N.Y. 2006) (quoting 23 *Williston on Contracts* § 63.8). But the very same section of the treatise goes on to describe an exception to that rule:

> There is also an exception to the rule that a party who commits the first breach of a contract is not entitled to enforce the contract ***when the breach does not go to the root of the contract*** but only to a minor part of the consideration, that is, when the breach is not material.

23 *Williston on Contracts* § 63.8 (emphasis added). Sanofi's failure to submit quarterly twelve-month rolling forecasts did not "go to the root of the contract." Under any

circumstances, it was a "minor part of the consideration," and it would be absurd to hold that Sanofi materially breached the License Agreement because it did not go through the pointless exercise of submitting forecasts to Elorac at a time when it did not foresee any sales.

Of course, Sanofi may well have been in breach of the License Agreement on January 15, 2016, for a different reason: the heart of this lawsuit is Elorac's claim that Sanofi breached the License Agreement by failing to use commercially reasonable efforts to commercialize the Product. But both parties seem to agree that the Court cannot determine the merits of that claim on summary judgment because there are genuine issues of material fact to be resolved. Therefore, the Court cannot grant summary judgment on Sanofi's counterclaim for Elorac on the basis that Sanofi was in material breach of the License Agreement at the time of the January 15, 2016 order.

### B. Whether Elorac Breached By Failing To Fill The January 15, 2016 Order

Elorac argues that it could not fill Sanofi's January 15, 2016 order because it had not received any orders or forecasts from Sanofi for over two years, so it had stopped manufacturing the Product at a high volume, which drove up manufacturing costs to such an extent that filling Sanofi's order would have been financially disastrous. Instead, Elorac exercised its right under section 4.11 to notify Sanofi that it could not fill the order. Upon Sanofi's request, Elorac immediately provided Sanofi with draft consent agreements that would allow Sanofi to contract directly with Elorac's subcontractors so that it could arrange to manufacture the Product itself. Instead of executing the consent agreements, Sanofi terminated the contract, claiming Elorac had materially breached by failing to fill its order.

Sanofi responds that Elorac's refusal to fill the January 15, 2016 order, combined with its failure to cure that breach within ninety days of Sanofi's March 3, 2016 notice of breach, constituted a material breach of the License Agreement under section 14.3. Additionally, Sanofi argues that Elorac's January 19, 2016 letter refusing to fill the January 15, 2016 order was a repudiation of the contract.

### 1. *Material Breach*

According to Sanofi, the License Agreement is essentially a requirements contract, in which a buyer agrees to purchase its requirements exclusively from a single seller, and the seller promises to supply the buyer with however much he requires, subject to the seller's own available supply. By failing to meet its essential obligation to supply Sanofi with the Product, Sanofi argues, Elorac materially breached the contract.

A material breach is one that "go[es] to the root of the agreement between the parties." *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997). A material breach excuses the non-breaching party's obligation to perform when it is "so substantial that it defeats the object of the parties in making the contract." *Id.*

The Court does not agree with Sanofi that Elorac materially breached the contract by failing to fill the January 16, 2016 order. The License Agreement, as the name itself implies, was not a pure requirements contract; it was a license agreement. Its essential purpose appears in its first substantive section, which granted to Sanofi "the exclusive license . . . to make, have made, use and Commercialize . . . the Product . . . in the Territory." (License Agreement § 2.1.) To be sure, Elorac expressly agreed elsewhere in the contract to "Manufacture for, and sell exclusively to sanofi-aventis during the Agreement Term, sanofi-aventis' requirements for the Product" (*id.* § 4.1), but it would be absurd to view

this as the "root" of the bargain when, at the time of contracting, there was no established market for the Product, which had not even obtained regulatory approval yet, and Sanofi had no "requirements" for the Product. Rather, the contract required Sanofi to *create* the market for the Product in Canada by way of a marketing and promotion campaign. The root of the bargain was the licensing arrangement that gave Sanofi the right to make, use, and sell the Product in Canada, along with accompanying duties.

Reinforcing this conclusion is the express recognition in the text of the contract that plaintiff would not manufacture the Product itself; it would manufacture it through subcontractors and would necessarily be at their mercy. Even in section 4.1, the provision that provides the principal support for Sanofi's position that the License Agreement is a requirements contract, Sanofi expressly "recognize[d] that the Product supplied by Licensor . . . is produced by a third-party subcontractor of the Licensor." Further, the contract's "failure to supply" provision provides as follows:

> Licensor shall immediately notify sanofi-aventis if Licensor is unable to fill any order placed by sanofi-aventis pursuant to Section 4.10. If Licensor is unable to cure such failure within ninety (90) days after such notice, Licensor shall permit the Second Source to manufacture the product or to make arrangements directly with a third party manufacturer, at sanofi-aventis' cost and expense, ***until such time as Licensor's subcontractor is again able to fill orders placed***.

(*Id.* § 4.11 (emphasis added).) The parties expressly contemplated that plaintiff's production might be disrupted by issues with its subcontractors, and they provided for that possibility in the contract.

The Court construes the contract as giving plaintiff the right, but not necessarily the duty, to manufacture and supply the Product for Sanofi, subject to the availability of subcontractors to perform the manufacturing. If Elorac determined that its subcontractors

could no longer manufacture the Product in a sufficiently economical way, it had the right to inform Sanofi that it could not fill its orders and assist Sanofi in manufacturing the Product itself or making its own arrangements with subcontractors.  Elorac did exactly this: upon receiving the January 15, 2016 order, Elorac promptly informed Sanofi, making specific reference to section 4.11 of the License Agreement, that it could not fill its order. Similarly, upon receiving a request from Sanofi to provide written consent for DPT to manufacture the Product directly for Sanofi, Elorac promptly provided a draft consent agreement.   The License Agreement did not require Elorac to do more under the circumstances.

Sanofi makes much of the fact that Elorac rejected the October 1, 2015 email order and the January 13, 2016 order before invoking section 4.11.  According to Sanofi, Elorac must have known all the while that it would reject a proper order in any case, and it acted in bad faith by failing to so inform Sanofi.  The Court does not agree that these facts show bad faith.   The parties were already engaged in heated litigation over the License Agreement during this time (Elorac filed this case in 2014), and Elorac was entitled to insist on strict compliance with the terms of the License Agreement, not only in hopes of reducing the likelihood of further disputes and misunderstandings, but also in order to determine whether it could fill the order.  The information contained in the forecast, if provided with the requisite ninety days' notice, would have helped Elorac determine whether it was economical to reestablish its relationship with its subcontractors and resume manufacturing the Product or instead invoke section 4.11 and leave the manufacturing to Sanofi.  The Court fails to see why Elorac's insistence on compliance with relevant terms of the License Agreement should qualify as a breach.

Sanofi also argues that Elorac's rejection of the January 15, 2016 order revealed a breach of contract that had occurred long before.  According to Sanofi, merely allowing the contractual relationship with DPT to lapse was a breach of contract because the License Agreement required plaintiff to "maintain production capacity for the manufacture of the Product . . . at a level necessary to produce the amount of Products set forth in the forecasts."  (*Id.* § 4.7.)  The argument is patently meritless.  At the time of the January 15, 2016 order, Sanofi had not submitted forecasts for years, so it can hardly maintain that Elorac breached the contract by failing to "maintain production capacity . . . at a level necessary to produce the amount of Products set forth in the forecasts."  There were no forecasts, so there was no level of production capacity for Elorac to meet in order to keep up with them.

Elorac did not materially breach the License Agreement in its conduct in connection with the January 15, 2016 order.

### 2. *Repudiation*

Sanofi contends that Elorac repudiated the contract by refusing to fill the January 15, 2016 order.

> An anticipatory repudiation, entitling the nonrepudiating party to recover damages for a total breach and excusing it from further performance . . . can be grounded upon a finding that the other party has attempted to avoid its obligations by advancing an untenable interpretation of the contract, or has communicated its intent to perform only upon the satisfaction of extracontractual conditions.

*SPI Commc'ns, Inc. v. WTZA-TV Assocs. Ltd. P'ship*, 644 N.Y.S.2d 788, 790 (App. Div. 1996) (internal citations and quotation marks omitted).  "A repudiation can be either a 'statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach' or 'a voluntary

affirmative act which renders the obligor unable or apparently unable to perform without such a breach.'" *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 705 N.E.2d 656, 659 (N.Y. 1998) (quoting Restatement (Second) of Contracts § 250). The repudiation must be "clear and unequivocal" to justify the opposing party's nonperformance. *Id.*

Elorac did not communicate in any "clear and unequivocal" terms that it was refusing to perform its obligations under the contract, nor did it take any "clear and unequivocal" action so indicating. As the Court has already explained, Elorac was within its rights under the License Agreement to promptly inform Sanofi that, after receiving Sanofi's forecast and purchase order, it could not fill the January 15, 2016 order, so long as it performed its obligation to assist Sanofi in arranging to manufacture the Product itself or contract with third-party manufacturers to produce it. Far from repudiating the contract, Elorac discharged its obligations under the contract by informing Sanofi immediately that it could not fill the order and facilitating Sanofi's arrangements with third-party manufacturers.

### C. Whether Sanofi Properly Terminated the Contract In August 2016

In August 2016, Sanofi terminated the License Agreement both for cause and, in the alternative, unilaterally, pursuant to section 14.2, which provided, "Sanofi-aventis shall have the unilateral right to terminate this Agreement, in whole or in part at any time by providing one hundred eighty days prior written notice to Licensor." It follows from the discussion in the preceding section of this opinion that Sanofi did not properly terminate the contract for cause because Elorac did not materially breach. (*See id.* § 14.3.) Elorac

argues that, because Sanofi was in breach, its unilateral termination of the contract was also ineffective.

As the Court has already explained, there remain genuine issues of material fact to be resolved before the Court can determine whether Sanofi was in breach of the contract in August 2016. But even if it was, Elorac cites no authority validly supporting its position that, as a result, Sanofi could not exercise its right to terminate the contract. The only case it cites on the matter, *DeCapua v. Dine-A-Mate, Inc.*, 744 N.Y.S.2d 417, 420 (App. Div. 2002), holds that a party to a contract cannot enforce the contract's restrictive covenant if that party is in breach because, under a contrary rule, the party would be able to benefit from a breach that it caused the other party to commit. Thus, in *DeCapua*, a party who had breached the contract's payment obligation could not then complain that the other party had breached the contract's restrictive covenant by doing business with a competitor; presumably, if the first party had abided by the terms of the contract, the other party would not have sought out other business partners. This case is dissimilar; the Court fails to see how, in the circumstances of this case, Sanofi would benefit from its own breach by exercising its right to unilaterally terminate the contract. That right does not depend on either party's performance under the contract. Further, it does not follow from *DeCapua* that a party who has breached a contract cannot exercise *any* rights under the contract, including a unilateral, unconditional right to terminate that is expressly provided by the plain language of the contract.

The Court agrees with Sanofi that, even if it did not have cause to terminate the contract under section 14.3 in August 2016, it could properly terminate the contract

unilaterally under section 14.2. Sanofi terminated the License Agreement with one hundred eighty days' notice on August 26, 2016, effective February 22, 2017.

<u>**CONCLUSION**</u>

For the reasons set forth above, the parties' motions for summary judgment are granted in part and denied in part. The Court grants partial summary judgment for Sanofi on its counterclaim and declares that Sanofi unilaterally terminated the License Agreement in its August 26, 2016 letter, effective February 22, 2017, but Sanofi's motion for summary judgment [376] is otherwise denied and Elorac's motion [389] is otherwise granted. Sanofi's motion to strike [412, 419] is denied. Status hearing set for 10/24/18 at 9:30 a.m. Parties are directed to file a joint status report by 10/19/18.


**SO ORDERED.**                              **ENTERED: September 24, 2018**

_____
**HON. JORGE ALONSO**
**United States District Judge**